No. 47,587

DEANNA CARNEGIE, *Appellee,* v. GAGE FURNITURE, INC., d/b/a TOM, DICK & HARRY, *Appellant.*

(538 P. 2d 659)

Opinion filed July 17, 1975.

*James L. Grimes, Jr.,* and *Michael J. Grady,* of Cosgrove, Webb and Oman, of Topeka, argued the cause and were on the brief for the appellant.

*Fred W. Phelps,* of Topeka, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This is an action for damages for malicious prosecution of a civil suit. Trial to a jury resulted in a judgment for plaintiff from which defendant has appealed.

Plaintiff Deanna Carnegie alleged in her petition that on July 29, 1970, defendant Gage Furniture, Inc., maliciously instituted a

replevin action against her for recovery of a color television set at a time when she was not in default under an installment contract to purchase the set and because of the groundless suit she incurred legal expense and suffered a neurosis which resulted in partial physical paralysis and expenses for medical and psychiatric care. She sought $100,000 compensatory and $100,000 punitive damages.

Defendant Gage Furniture in its answer denied the replevin suit was groundless or maliciously instituted and alleged that any expenses and damages incurred by plaintiff did not result from its acts.

Upon issues thus joined a jury rendered a general verdict for plaintiff for $45,000 compensatory damages, upon which judgment was entered. Posttrial motions were overruled and this appeal ensued.

The testimony adduced at trial revealed the following: On November 12, 1969, plaintiff-appellee entered into an installment contract to rent and/or purchase a color television set from Martin Amusement Company for the sum of $287.00. Sales tax of $8.61 added to the purchase price made a total contract figure of $295.61. Monthly payments by appellee of $25.00 were to be applied 40% to rental of the TV and 60% to its purchase. Martin was to repair and service the set throughout the term of the contract. The contract was written in summary fashion on Martin's printed duplicate sales order forms and was signed by appellee. Appellee testified that although the written contract did not reflect it, her monthly payments were to be due around the 18th of the month and that *all payments after the first six were to be applied 100% toward the purchase of the set.*

Appellee made $25.00 payments in November and December, 1969, and in January and February, 1970. She made no payment in March but contacted Martin Amusement and assured it she would make her April payment. Appellee made a further $25.00 payment to Martin in April, 1970. Some time in March or early April, 1970, Martin assigned its rental-purchase contract with appellee to appellant Gage Furniture. On April 16, 1970, appellant sent a card to appellee that her April rental payment was overdue. The notice also contained a statement that appellee would be subject to a 50¢ per day late charge. Upon receipt of this notice appellee telephoned appellant's offices and advised she had sent her April payment to Martin. She expressed discomposure at the reference to the 50¢ late charge. Following this

conversation appellant contacted Martin and learned it had received a payment, which payment was then forwarded and received by appellant on April 17, 1970.

Subsequently appellee had a conversation with appellant's vice-president, Carl L. Lewis, about entering into a new contract concerning the TV set—she wanted her obligation with appellant and her balance in writing as she was concerned that her arrangement remain the same. Appellee was told to furnish the contract. Appellee then contacted a law student, gave him her records and all the information concerning the transaction and he in turn typed the following instrument:

### "CONTRACT OF SALE

"Vendor, Tom Dick and Harry's hereby agrees to sell, and Purchaser, Mrs. Deanna Carnegie, agrees to purchase one Heath Kit Color T. V. for the balance remaining on a contract between Martin Amusement and Deanna Carnegie, which contract has been assigned to Tom Dick and Harry's, said balance is hereto agreed to be $205.61. Payments are to be in the amount of $25 per month to be paid on or before the 18th of every month. The parties hereby agree that the remaining purchase price of $205.61 includes any computation of interest and that no additional interest whatsoever will be added to this sum.

"In the event of a default in making payments by Mrs. Carnegie, she will be allowed an additional 30 days to come forward with payment and until this additional period elapses, will not be deemed to be in breach of this contract.

"Vendor shall repair said T. V. in agreement with past rental contract as agreed previously, to the above contract, after which Mrs. Carnegie will be responsible for repairs."

Appellee took the contract to appellant's office where on May 5, 1970, it was signed by her and appellant's vice-president. The instrument was not dated. On the same day appellee made a $25.00 payment to appellant which appellant credited as a rental-purchase payment under the old Martin contract (it is the application of this payment which really forms the crux of this lawsuit). Appellee testified she thought she was making this May 5th payment as the first one due under the new purchase contract. Appellant's testimony was that this payment was to apply on the balance due on the old Martin contract, being the sixth and reducing the amount due on it to the sum of $205.61 ($295.61 less six purchase-price payments of $15.00 or $90.00). On May 5, 1970, appellant gave appellee a receipt for this $25.00 payment which read "Rental on TV" and appellee accepted it without demurral.

On June 2, 1970, appellee returned to appellant's store to make

another payment. A dispute arose between her and appellant's vice-president because he had written the word "rental" on her proposed receipt. Appellee insisted she would not accept such a receipt because she was purchasing, not renting the TV. There was some dispute as to exactly what occurred but in any event angry words were exchanged and appellee picked up her money and left without making a payment. Appellee went that same day to the buyer protection division of the attorney general's office with her grievance, which agency wrote two letters and made a telephone call to appellant concerning the affair.

Appellee made no further payments on the contract until July 9, 1970, at which time she paid $25.00. Thereafter appellee made a $25.00 payment each month until the balance owing was fully paid.

Meanwhile, on July 29, 1970, believing that appellee was two payments in arrears under her contract appellant, upon advice of its then legal counsel, Mr. John Bell, filed a replevin action in magistrate court. Appellee became very disturbed when deputy sheriffs attempted to execute the replevin order, she retained an attorney and posted a redelivery bond so she might retain possession of the TV set. As a result of her distress over the attempted repossession she suffered physical and mental disability, diagnosed as anxiety neurosis with conversion symptoms, and underwent extensive medical and psychiatric treatment.

Trial to the magistrate judge was held in the replevin action on December 15, 1970. This resulted in a judgment for appellee on the judge's conclusion that the suit had been commenced prior to default by reason of the thirty day grace period. Appellant then filed a motion for new trial which, after hearing, was granted. The second trial in magistrate court was heard by a different judge on April 27, 1971. This judge also held for appellee on his conclusion appellee was not in default by reason of her June 2d tender of payment. At the time of the second trial appellee had paid appellant in full in continued monthly payments the amount asserted by it to be due and owing under the May 5th contract. After the conclusion of the first trial appellant was threatened with a malicious prosecution suit on appellee's behalf and it tried the replevin case a second time in an effort to establish that it had probable cause to commence the action. One magistrate court judge did testify that in his opinion appellant had probable cause to institute the replevin suit.

On appeal appellant's principal point is that it had probable cause as a matter of law to bring the replevin action and the trial court erred in submitting the case to the jury. The point was preserved at trial level by motions for directed verdict and for judgment notwithstanding the verdict.

At the outset it may be noted that in order to maintain an action for malicious prosecution the plaintiff must prove that the defendant instituted the proceeding of which complaint is made, that defendant in doing so acted without probable cause and with malice, that the proceeding terminated in favor of plaintiff, and that plaintiff sustained damage; plaintiff must prove both malice and lack of probable cause and unless each is proved, plaintiff's claim must fail; further, the inquiry as to the want or existence of probable cause is limited to the facts and circumstances which were apparent at the time the prosecution was commenced; and where facts are in dispute the issue of probable cause is for the jury to determine but where there is no factual dispute it is a question of law for the court (see *Stohr v. Donahue*, 215 Kan. 528, 527 P. 2d 983, and cases therein cited).

In 52 Am. Jur. 2d, Malicious Prosecution, § 51, these definitions of "probable cause" appear:

". . . With reference to civil actions, probable cause has been said to be such reason supported by facts and circumstances as will warrant a cautious man in the belief that his action and the means taken in prosecuting it are legally just and proper; or a knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. A definition sufficiently exact to meet satisfactorily every possible test would be difficult, if not impossible, to furnish, for the complete legal idea expressed by the term 'probable cause' is not to be gathered from a mere definition. However, notwithstanding the different wordings of the many judicial definitions referred to, there seems to be sufficient substantial agreement among them to warrant the statement that the standard of conduct for beginning or continuing any proceeding, whether civil or criminal, is that of a reasonable or ordinarily prudent man placed in the same situation as the defendant. That is, if a reasonable man would have believed and acted under the circumstances as the defendant did, there would be probable cause; otherwise not.

"Probable cause does not mean sufficient cause. One need not be certain of the outcome of a criminal or civil proceeding to have probable cause for instituting such action. The test is rather whether there was reasonable cause." (pp. 217-218.)

It is generally held that where one in good faith seeks the advice of legal counsel and under such advice institutes an action against another, he does not thereby render himself liable to an action for

malicious prosecution (54 CJS, Malicious Prosecution, § 52, p. 1018). However, when a defendant seeks to rely on the advice of counsel to establish probable cause for instituting an action it must appear that he fully disclosed to counsel the facts surrounding the charge as well as those which can be learned by reasonable effort (*Railroad Co. v. Brown*, 57 Kan. 785, 48 Pac. 31).

Appellant's argument that probable cause existed as a matter of law may be summed up in this fashion: The contract signed on May 5, 1970, was ambiguous in that it was undated and did not refer to the payment made on that date or say how it would be applied and that by any reasonable interpretation and from appellee's own admissions and conduct it had to be applied as the sixth payment under the old Martin rental-purchase contract and any reasonable person in appellant's position would so understand and act accordingly; that appellant received no payment for the months of May or June (any tender in June did not amount to payment for that month and did not bar bringing an action on the debt) and appellant was justified in believing appellee was in default; and further appellant sought and relied upon advice of counsel and filed the replevin suit as recommended by counsel.

On this issue appellee counters that the jury determined that appellant started the replevin suit without probable cause and there was sufficient evidence to support its finding because in three respects appellant did not lay all the facts before its counsel and cannot rely on his advice to establish probable cause for bringing the suit in that: (1) Appellant did not fully inform counsel as to what transpired on June 2, 1970, when the dispute over wording of the receipt occurred and did not inform him of appellee's tender of a payment; (2) appellant advised Mr. Bell the new contract was made on April 17, 1970, rather than on May 5, 1970, thus misrepresenting that appellee had made only one payment on a contract which commenced on April 17, 1970; and (3) in July prior to the time the replevin suit was filed on July 29, 1970, appellant failed to disclose to Mr. Bell that appellee had made a $25.00 payment on July 9, 1970. In connection with this third item the record on appeal does establish that, in its written information furnished to Mr. Bell concerning appellee's account, appellant failed to disclose to him that she had made a $25.00 payment on July 9th. We are unable to see how any confusion respecting the date of the new contract has any bearing on the issue of probable cause as argued by appellee.

Respecting the matter of tender, a substantial dispute in the replevin action developed over the June 2, 1970, confrontation between appellee and appellant's vice-president. Although the magistrate court eventually ruled that appellee made a bona fide tender of payment on that date, at the time the suit was initiated no such determination had been reached. Evidence received at the trial of the instant action supported differing versions of the June 2d meeting. Appellee testified she placed $25.00 on appellant's counter and was treated offensively in her good faith attempt at payment; appellant's testimony was that appellee declined to leave the payment despite efforts to please her by writing the receipt any way she wanted it. There was undisputed testimony that attorney Bell was informed by appellant of the incident.

The parties' theories under the evidence thus are as follows: Appellee asserts that under her new contract with appellant she made a payment for the month of May (the May 5th payment), she admits she did not make a June payment because she was rebuffed but points out the undisputed fact she made a payment on July 9th, so that at the time the replevin suit was filed (July 29, 1970) she could not from any reasonable viewpoint be more than one payment in default but the replevin suit was filed within the thirty day grace period allowed by the contract for default of one payment. Appellant says that under the records of appellee's account including both contracts, and her actions, it was reasonably justified in concluding she was delinquent at least one payment for more than the thirty day grace period at the time the replevin suit was instituted, and that such was in fact the case. Appellant's theory is premised on the fact the May 5th payment was actually to apply on the old Martin contract, as evidenced by the records and testimony in the case, so that on July 29th when suit was filed there had been only one $25.00 payment made to take care of three payments which had become due under the new contract: On May 18th, June 18th and July 18th. Thus it appears the point of difference is the application to be made of the May 5th payment.

Appellee testified she turned over all her receipts and information to the law student selected by her and he arrived at the figure of $205.61 which he typed in as the balance to be paid under the purchase contract prior to the time she took it to appellant's office. Appellee was unable to state how that particular figure was arrived at. She was confronted on cross-examination with the fact that 60% of the six $25.00 payments she was to make on the con-

tract prior to her being credited with the full 100% of payments toward purchase, amounted to $90.00 and further that $90.00 deducted from the total price of $295.61 of her Martin contract left the sum of $205.61, the exact amount of her new purchase contract. Her only response was that the law student had determined the amount from the information she had given him and she did not remember how it was done. The law student did not testify. Among the records produced by appellee at the trial were the notice form and the envelope she had received from appellant in April concerning the then missing April payment. On the back of these exhibits, which presumably were among those turned over by appellee to her student lawyer, there were figures indicating that the sum of $75.00, the amount paid by appellee prior to May 5, 1970, on the purchase of the TV set, had been subtracted from $295.61, the Martin contract price, apparently in an effort to determine the balance of the purchase price then due, leaving the remainder as the sum of $220.61. Appellee was unable to testify who had done this figuring or why, although these were records that had remained in her possession.

The fact remains, of course, that if the new contract was simply a continuation of the previous arrangement with Martin *as testified to by appellee,* there had to be a sixth $25.00 payment made to bring the remainder down to the $205.61 figure ($295.61 minus 60% of $150.00 equals $205.61). Consequently the May 5th payment had to be the sixth or April payment on the Martin contract, in accord with appellant's version of events. Appellee does not suggest any other way by which the contract price of $205.61 could be reached and manifestly there is none. Appellee testified she selected the 18th of each month as the time each payment was to be made. On May 5th she accepted without protest a receipt marked "Rental on TV" at a time when a payment on the new contract was not yet due. This court has frequently recognized that admissions made by a party are the strongest kind of evidence. The proposition of law to be applied under these circumstances has been stated as follows: A verdict cannot be upset if there is any evidence in the record to support it, where such issue is presented without complicating factors, but such rule yields to the impact of admissions made by a party in his testimony while a witness in the case, and such admissions are binding and conclusive upon him if uncontradicted or unexplained, whether such admissions are elicited on direct examination or on cross-examination

of the party (*Hallett v. Stone,* 216 Kan. 568, 534 P. 2d 232). Admissions derived from a party's own conduct may likewise be so considered.

The only conclusion to be drawn from appellee's admission that she wanted a continuation of the Martin contract, her testimony that the purchase price of the new contract was to be the sum of $205.61 as derived from the records and information given by her to the law student, and her conduct in accepting the May 5th receipt marked "Rental on TV," is that the May 5th payment was to be applied on the Martin rental-purchase contract and not to the new one. There was then no dispute on the matter to submit to the jury. This being so, it follows that, as a matter of law, there were sufficient grounds under all the circumstances for appellant, acting as a reasonably cautious person, to believe appellee was in default under her purchase contract at the time the replevin suit was instituted—three payments had become due, only one had been paid. The issue of want of probable cause should not have been submitted to the jury and the trial court erred in denying appellant's motions for directed verdict and for judgment notwithstanding the verdict.

Appellee argues there was a want of probable cause shown by reason of evidence adduced by her that appellant's counsel had said she had given them a hard time and they were "after" her. This may well have been evidence of malice but malice is not the same thing as the failure to act as a reasonable person would in the circumstances, that is, malice is not in itself the same thing as want of probable cause, although a want of probable cause may be evidence of malice (52 Am. Jur. 2d, Malicious Prosecution, § 47, p. 215). As already indicated, a plaintiff must prove both malice and lack of probable cause and unless each is proved the plaintiff's claim must fall (*Thompson v. General Finance Co., Inc.,* 205 Kan. 76, 468 P. 2d 269). Here appellee's claim must fall because she did not prove lack of probable cause.

One further matter remains for consideration—taxation of the costs for reproducing the record on appeal. Much of this record consists simply of the reporter's transcript of the proceedings. Some unnecessary exhibits were included. The situation developed when appellant narrated the testimony of seven witnesses, appellee counter designated a narrative of eleven which included duplication of five of those submitted by appellant; neither party was satisfied with the designation of the other and yet neither was willing

to emend the narrative of the other, or to submit his own to such emendation, by substituting verbatim testimony considered essential. The parties came to an impasse which the trial court was not able wholly to resolve, with the result a record on appeal of 496 pages costing $1,491.73 was filed. Our rules for preparing a record on appeal contemplate cooperation between counsel in its preparation which was totally lacking here (Rule 6 [c] and [e], 214 Kan. xxiii-xxiv; see also Blaes, "Another Look at Civil Appellate Procedure", Kansas Judicial Council Bulletin, Dec. 1965, p. 68, 70-75). Our conclusion is that the parties have been equally at fault. Each has presented a narrative of testimony somewhat slanted and incomplete; each declined to emend by substitution and an appropriate narrative; and appellee designated some matter which was irrelevant to the points on appeal. Accordingly, the costs of reproducing the record on appeal will be assessed one-half to each party.

The judgment is reversed.

APPROVED BY THE COURT.

FROMME, J., not participating.