(913 P.2d 1206)
No. 71,519 ■

PHILLIP L. KNIGHT, *Appellant/Cross-Appellee*, v. RICHARD D. CORDRY, *Appellee/Cross-Appellant*.

Opinion filed May 19, 1995.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, of Topeka, for appellant.

*Richard L. Honeyman* and *F. James Robinson, Jr.*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, for appellee.

Before BRAZIL, P.J., GERNON, J., and J. BYRON MEEKS, District Judge, assigned.

BRAZIL, J.: Richard D. Cordry, the defendant in this malicious prosecution action, is an attorney who represented Timothy and Rhonda Zywicki in their medical malpractice action filed against Dr. Phillip L. Knight. That action was eventually dismissed voluntarily by the Zywickis. Dr. Knight then filed this action. The case

went to trial, and the jury awarded Dr. Knight $150,000 in unspecified damages. On its own motion, the trial court held that the jury verdict shocked the court's conscience and was contrary to the evidence. The court ordered a remittitur of $20,000 or, in the alternative, a new trial. Dr. Knight rejected the remittitur, and the court ordered a new trial. Dr. Knight appealed the decision of the trial court to order a new trial. This court dismissed his appeal as premature. (*Knight v. Cordry*, No. 68,304, unpublished opinion filed September 17, 1993.)

At the close of the evidence in Dr. Knight's second trial, the court granted Cordry's motion for directed verdict. Dr. Knight appeals the directed verdict and the order for a new trial. Cordry cross-appeals the court's admission of expert testimony by Dr. David Kingfisher. We affirm.

Cordry first spoke with the Zywickis in August 1986 about the death of their son Dathan at a Wichita hospital. At the time, Cordry was associated with a Wichita law firm. Cordry consulted with others in the firm and the group decided to take the case.

Cordry collected medical records, interviewed the Zywickis, and consulted medical texts. Cordry also contacted an Army physician identified by the Zywickis as a possible source of information. Cordry received a letter from the Army stating that the doctor was not allowed to render opinions in medical malpractice cases.

In June 1987, Cordry sought the opinion of Dr. Marshall Schwartz, a pediatric surgeon he had consulted on prior cases. Dr. Schwartz reviewed Dathan's medical records and concluded that Dr. Knight did not deviate from standard medical practice.

Cordry met with the Zywickis and explained the negative report. The Zywickis indicated that they wanted to pursue the case and asked Cordry to try to get another opinion. In August 1987, Cordry contacted Dr. Steven E. Lerner and Associates and requested that the firm locate an expert to evaluate the Zywicki claim.

The firm procured for Cordry the testimony of Dr. Gary Young, an emergency physician. Dr. Young reported to Cordry in November 1987 that Dathan received "substandard" care. Cordry filed suit against Dr. Knight, the Wichita hospital, and the United States

of America in May 1988, 7 days prior to the expiration of the statute of limitations.

Discovery ensued. Cordry deposed a number of doctors and nurses involved in Dr. Knight's care of Dathan, none of whom testified negatively about Dr. Knight's care. Dr. Knight obtained a number of expert opinions stating that he did not breach the duty of care. Trial was set for January 1990. Cordry filed a motion for continuance, alleging that he had a conflict with another trial in federal court. Cordry testified that by that time the Zywickis had left the country. The action was dismissed without prejudice.

Cordry contacted the Zywickis by letter in June 1990. The letter stated that Cordry understood that they did not wish to refile the lawsuit. Cordry stated in the letter that he recommended against refiling the lawsuit. Cordry did not refile the lawsuit.

Dr. Knight filed suit against Cordry, Lerner and Associates, and Dr. Young for malicious prosecution in January 1991. The court granted Lerner's and Dr. Young's motions for summary judgment, and they were dismissed from the case.

Dr. Knight argues that the trial court erred in granting a directed verdict against him at the close of his evidence in the second trial. Dr. Knight and Cordry agree that the court, although it clearly stated in the record and in its journal entry that it was granting a motion for involuntary dismissal, in effect granted a motion for directed verdict.

K.S.A. 60-241(b) states:

"After the plaintiff, *in an action tried by the court without a jury*, has completed the presentation of the plaintiff's evidence, the defendant . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." (Emphasis added.)

Under the language of the statute, an involuntary dismissal may only occur in a nonjury trial. The proper designation for a motion on plaintiff's evidence in a jury trial is a directed verdict, and this court may treat the motion granted by the trial court as such. See *Amino Brothers Co. Inc. v. Twin Caney Watershed District*, 206 Kan. 68, 73, 476 P.2d 228 (1970).

Plaintiff must present proof of five elements in a malicious prosecution action:

"(1) that defendant initiated, continued, or procured the proceeding of which complaint is made; (2) that defendant in doing so acted without probable cause; (3) that defendant must have acted with malice; (4) that the proceedings terminated in favor of plaintiff; and (5) that plaintiff sustained damages." *Lindenman v. Umscheid*, 255 Kan. 610, 624, 875 P.2d 964 (1994).

The trial court noted these elements in its decision on the directed verdict motion. The court stated that it considered the evidence and inferences to be drawn from it in the light most favorable to Dr. Knight. The court found no evidence that Cordry did not have probable cause to file the suit or that he acted with malice. The court held that even assuming there was an inference to be drawn from the evidence that Cordry had no probable cause to file the malpractice suit against Dr. Knight, the special rule regarding attorney liability for malicious prosecution operates to bar jury consideration of the case because there was no evidence that Cordry was not simply aiding his client in obtaining proper adjudication of the malpractice claim.

Dr. Knight argues that the existence of probable cause is a jury question. "[W]here the facts are in dispute the issue of probable cause is for the jury, but where there is no factual dispute it is a question of law for the court." *Stohr v. Donahue*, 215 Kan. 528, 530, 527 P.2d 983 (1974). Dr. Knight fails to point out what facts surrounding the issue of probable cause were in dispute, and a review of the record reveals none. The existence of probable cause is thus a question of law over which this court has unlimited review. *Hillman v. Colonial Penn. Ins. Co.*, 19 Kan. App. 2d 375, 376, 869 P.2d 248, *rev. denied* 255 Kan. 1001 (1994).

Dr. Knight argues that the court erred in determining that Cordry had probable cause to file suit against Dr. Knight. The concept of probable cause is not clear-cut. " 'A definition sufficiently exact to meet satisfactorily every possible test would be difficult, if not impossible, to furnish, for the complete legal idea expressed by the term "probable cause" is not to be gathered from a mere definition.' " *Carnegie v. Gage Furniture, Inc.*, 217 Kan. 564, 568, 538 P.2d 659 (1975). With this in mind, Kansas courts have adopted

the following definition of probable cause in a malicious prosecution action: "Probable cause for instituting a proceeding exists when there is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious or prudent man in the belief that the party committed the act of which he is complaining." *Nelson v. Miller*, 227 Kan. 271, 277, 607 P.2d 438 (1980).

Dr. Knight argues that Cordry did not have probable cause to file suit because he did not let the Zywickis decide whether to file suit after he received Dr. Young's report. Dr. Knight cites the following language from *Nelson*:

> " 'd. *Attorneys*. An attorney who initiates a civil proceeding on behalf of his client or one who takes any steps in the proceeding is not liable if he has probable cause for his action . . . and even if he has no probable cause and is convinced that his client's claim is unfounded, he is still not liable if he acts primarily for the purpose of aiding his client in obtaining a proper adjudication of his claim. . . . *An attorney is not required or expected to prejudge his client's claim, and although he is fully aware that its chances of success are comparatively slight, it is his responsibility to present it to the court for adjudication if his client so insists after he has explained to the client the nature of the chances.*
>
> " 'If, however, the attorney acts without probable cause for belief in the possibility that the claim will succeed, and for an improper purpose, as, for example, to put pressure upon the person proceeded against in order to compel payment of another claim of his own or solely to harass the person proceeded against by bringing a claim known to be invalid, he is subject to the same liability as any other person.' " (Emphasis added.) 227 Kan. at 282-83 (quoting Restatement [Second] of Torts § 674, comment d).

Dr. Knight construes the emphasized language as some sort of component of probable cause. This is an incorrect construction. The *Nelson* court adopted the Restatement rule that an attorney is not liable for malicious prosecution even without probable cause to file suit unless the attorney acted with an improper purpose. The court in the passage above was not discussing probable cause but improper purpose. The court concluded that there was no improper purpose where an attorney explained the slim chances of recovery with his or her client and the client insisted on filing suit. The court did not state that an attorney does not have probable

cause to file suit unless his client reviews the evidence available and gives him or her permission to proceed.

In any event, Dr. Knight points to no evidence which suggests that the Zywickis did not wish to file suit, and a review of the record reveals none. In fact, Cordry testified that he communicated Dr. Schwartz' negative report to the Zywickis and they asked him to "please pursue the case further" and get another expert opinion.

Probable cause is to be determined considering the circumstances at the time the suit was filed. *Stohr v. Donahue*, 215 Kan. at 530. Cordry testified that he based his decision to file suit against Dr. Knight on three things: Dr. Young's opinion, information given to him by the Zywickis, and information contained in Dathan's medical records.

Dr. Young concluded in his report that:

"Dathan's vomiting was not treated with a nasogastric tube and he developed aspiration in the lungs which resulted in irreversible respiratory acidosis. Dathan's severe dehydration was allowed to progress to irreversible shock without benefit of the obvious treatment of IV fluids. In the 5 hours prior to his death when he was under the care of physicians at McConnell and at Wesley Med. Ctr., Dathan should have received enough IV fluid to improve his dehydration from moderately severe to mild. He should not have died from an easily treatable problem, dehydration, and a preventable problem, aspiration."

Dr. Young also noted that Dr. Knight incorrectly characterized Dathan's cause of death as " 'overwhelming pneumococcal sepsis' " and stated that Dathan's care was "substandard."

This report, along with information contained in Dathan's medical records and circumstances described by the Zywickis, forms a basis for a reasonable suspicion that Dr. Knight committed malpractice in his treatment of Dathan. Further, Dathan's death while under Dr. Knight's care is a circumstance which could support the belief of a prudent person that malpractice occurred. The trial court did not err in holding that the evidence could not support a finding that Cordry did not have probable cause to file suit.

After the first trial, Dr. Knight appealed the trial court's order for new trial. Cordry cross-appealed, arguing that the court erred in refusing to determine the existence of probable cause as a matter of law in response to Cordry's motion for summary judgment, mo-

tion for directed verdict, and motion for judgment notwithstanding the verdict. This court dismissed Dr. Knight's appeal as premature. This court also stated that "[t]he other issues on appeal and cross-appeal in the present case concern errors allegedly made by the trial court and, therefore, at this interlocutory stage, should not be addressed at this time." .·

Without plunging deep into an analysis of whether this court should have considered the probable cause issue as part of the first appeal, it is clear that the trial court's grant of a directed verdict in the second trial is a final order and this court may now address any issue it considered interlocutory in the first appeal. Cordry does not argue in his second cross-appeal that the trial court should have found probable cause as a matter of law in the first trial. However, there are three factors that compel this court's consideration of the matter: (1) this court's possibly erroneous decision not to consider Cordry's first cross-appeal, (2) Dr. Knight's present arguments regarding the propriety of an order for new trial or remittitur after the first trial, and (3) the absolute symmetry of the facts regarding probable cause at the first and second trials.

· During the first trial, Cordry filed a motion for summary judgment, a motion for directed verdict, and a motion for judgment notwithstanding the verdict, all of which argued that Dr. Knight failed to prove Cordry filed suit without probable cause as a matter of law. The trial court denied the motions. This court did not consider the issue as raised in Cordry's cross-appeal.

The facts supporting the existence of probable cause in the second trial are identical to those presented in the first trial. Cordry interviewed the Zywickis on several occasions, ordered Dathan's medical records, consulted a treatise on pediatric medicine, and obtained an expert opinion from Dr. Young. Cordry sought and obtained a negative report from Dr. Schwartz and received no opinion from the military doctor.

In the first appeal, Dr. Knight argued that Cordry had no probable cause to file suit because he had not conducted an adequate prefiling investigation. The court in *Nelson* stated: "In determining probable cause in a malicious prosecution action brought against an attorney, a jury may properly consider not only those facts dis-

closed to counsel by the client but also those facts which could have been learned by a diligent effort on the attorney's part." 227 Kan. at 284.

The court's statement in *Nelson* merely dictates that an attorney may not rely on a fact scenario presented by a client as a basis for filing suit. Cordry did not rely solely on the fact scenario presented by the Zywickis for determining the circumstances surrounding Dathan's death. Cordry obtained the medical records to support the fact scenario described by the Zywickis. Dr. Knight argues that the investigation was inadequate because Cordry did not give Dr. Knight an opportunity to present his version of the facts. Dr. Knight does not allege, however, what fact he could have provided to Cordry that Cordry had not already documented through Dathan's medical records.

Dr. Knight cites the following language in *Nelson* to support his claim:

"In determining the purpose of the attorney in filing a civil action, a jury may properly consider as evidence of good faith or absence of malice the fact that the attorney, before filing an action, made a demand upon his client's adversary and extended to him the opportunity to respond with his version of the facts. This should be the standard procedure unless an immediate filing of an action is required by the imminent running of the statute of limitations or some other good reason." 227 Kan. at 284-85.

First, the existence of a prefiling demand does not go to the question of probable cause, but to improper purpose. Second, the court stopped short of equating a lack of demand with malice.

Dr. Knight places much emphasis on the fact that he obtained several expert opinions prior to trial indicating that Dr. Knight did not breach the standard of care. He concludes that since Cordry had knowledge of these negative opinions, Cordry could not have had probable cause to file suit. The court in *Nelson* stated that " '[a]n attorney is not required or expected to prejudge his client's claim.' " 227 Kan. at 283. There is no support for Dr. Knight's argument that Cordry should have weighed Dr. Young's opinion against Dr. Knight's experts and declined to file suit.

The facts supporting the existence of probable cause are the same in both trials. Under the law as set out in *Nelson*, the record

in both trials reflects that probable cause to file suit existed as a matter of law. The trial court was correct in directing a verdict in the second trial and erred in submitting the question to the jury in the first trial. In light of this conclusion, Dr. Knight's remaining issues and Cordry's cross-appeal need not be addressed.

Affirmed.