**Rodney Joe FILLMORE, Plaintiff,**

v.

**Miquel ORDONEZ, individually and as Osage County Sheriff; Eldon Croucher; Gerald Nitcher; Darrel Manning; Lori Dunn; and Ken Fozdick, Defendants.**

Civ. A. No. 92–4074–DES.

United States District Court,
D. Kansas.

July 29, 1993.

Rodney Joe Fillmore, pro se.

Donald Patterson, Fisher, Patterson, Sayler & Smith, Topeka, KS, for defendants.

### MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter is before the court on the motion of the plaintiff for summary judgment (Doc. 59) and on the defendants' joint motion for summary judgment (Doc. 56).

### Nature of the Claim

Plaintiff brings this *pro se* action for monetary damages pursuant to 42 U.S.C. § 1983 against the Sheriff of Osage County and several deputy sheriffs.[1] Among other contentions, he argues that he was unlawfully arrested and detained for five days in the Osage County jail; that his briefcase was unlawfully seized and searched; that he was unlawfully prosecuted for obstruction of official duty; that he was denied meaningful telephone access to legal counsel; that he was denied certain law books and other legal materials he requested; that he was effectively deprived of adequate food because the defendants failed to provide a diet consistent with his religious beliefs; that he was denied a suitable mattress; and that he was subjected to the deliberate infliction of pain while in the defendants' custody.

The defendants, Osage County Sheriff Miquel Ordonez and five deputy sheriffs, all deny that plaintiff was deprived of any of his federal rights during his arrest, booking, and detention in the Osage County jail. Defendant Ordonez, who is sued in his official capacity on two of plaintiff's claims, denies that he maintains any policy, regulation, custom, or procedure that denies anyone any rights protected by the Constitution or laws of the United States. With regard to plaintiff's other claims against Ordonez and his claims against the deputy sheriffs in their individual capacities, the defendants jointly contend that they are entitled to qualified immunity.

### Jurisdiction and Venue

The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Venue is proper under 28 U.S.C. § 1391(b)(1) and (2).

### Summary Judgment Standards

Under Fed.R.Civ.P. 56, the court is compelled to render summary judgment on behalf of a moving party if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510.

The moving party has the burden of showing the absence of a genuine issue of material fact. This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "[A] party opposing a properly supported motion for summary judgment may not rest on mere

---

1. Osage County Attorney Cheryl Stewart was also named originally as a party defendant. However, plaintiff's claims against Stewart have since been dismissed without prejudice (Doc. 55).

allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514. The nonmoving party must go beyond the pleadings and designate specific facts, by affidavits, depositions, answers to interrogatories, and admissions on file, showing that there is a genuine issue for trial. *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. at 2552. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514.

The court must consider factual inferences tending to show triable issues in the light most favorable to the existence of those issues. *United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986). The court must also consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). However, a mere scintilla of evidence in favor of the nonmoving party is insufficient to create a genuine issue of material fact. *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

■ When a defendant raises the affirmative defense of qualified immunity in a motion for summary judgment, the burden shifts to the plaintiff to come forward with facts or allegations which demonstrate that the defendant's alleged violation of the law should have been apparent in light of pre-existing law. *Jantz v. Muci,* 976 F.2d 623, 627 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). Once the plaintiff has done so, the defendant assumes the normal burden of a movant for summary judgment of establishing that no material facts remain in dispute that would defeat his claim of qualified immunity. *Id.* (citing *Powell v. Mikulecky,* 891 F.2d 1454, 1457 (10th Cir.1989)).

*Facts*

For the purpose of resolving the parties' summary judgment motions, the court makes the following findings of fact.

At approximately 9 p.m. on December 7, 1991, defendant Eldon Croucher, a deputy sheriff in Osage County, stopped a truck for speeding on U.S. Highway 56. Defendant Croucher had checked the truck's speed with radar equipment at 69 mph in a 55 mph zone. The sole occupant of the truck was the plaintiff, Rodney Joe Fillmore, who immediately exited the truck and approached Deputy Croucher's vehicle, asking why he had been stopped. He denied he had been speeding. He also denied he had been driving, but admitted he had been causing movement of the truck from which he had emerged.[2]

Defendant Croucher had known plaintiff and his family for approximately 30 years, since their childhood days. When defendant Croucher asked plaintiff for his driver's license, plaintiff responded that he did not have one. Upon defendant Croucher's request, plaintiff produced the truck's registration and proof of insurance. The truck was registered in the name of plaintiff's brother. Defendant Croucher then asked plaintiff whether he had a license in another state and whether he was driving with a suspended license. Plaintiff refused to answer, noting that driving with a suspended license was a crime. Defendant Croucher told plaintiff that if he did not respond to his questions, he would be arrested for obstructing legal process. Plaintiff again declined to respond, stating that he was not waiving any of his rights. Plaintiff was otherwise fully cooperative.

Defendant Croucher then placed plaintiff under arrest for obstructing an officer in the performance of his legal duty and for failing to display a driver's license on demand. Plaintiff requested that defendant Croucher allow him to sign a Notice to Appear instead of arresting him, but defendant Croucher declined to do so. Plaintiff was handcuffed and pat-searched, and was then seated in defendant Croucher's patrol car.

2. Plaintiff now admits that he was "exercising his liberty via locomotion" in the truck. He contends that "driving" is a commercial activity and he therefore was correct when he told Croucher he had not been "driving."

Defendant Croucher asked the plaintiff if his truck was secure, and plaintiff responded that it was. Defendant Croucher explained that if plaintiff left the truck on the side of the highway, the county could not be held responsible for any damage. Plaintiff agreed. Defendant Croucher then exited his vehicle and approached plaintiff's truck to ensure that it was secure. He saw a brief-case and a zippered deposit bag resting on the seat of the truck, and he seized them. Next, he took the keys out of the truck and locked it behind him. Defendant Croucher did not conduct an inventory search of the truck, nor did he impound the vehicle. Defendant Croucher returned to the police car carrying plaintiff's briefcase and money bag. Plaintiff protested defendant Croucher's search of the truck and the seizure of his personal property.

On the drive to the Osage County jail, defendant Croucher recited plaintiff's *Miranda* rights.

Upon their arrival at the jail, plaintiff's property was inventoried. He was carrying on his person approximately $465.00 in cash. In addition, he carried a Sam's Club card showing plaintiff's picture, but bearing the name Gary Thompson. In addition, he was carrying two telephone credit cards, one bearing the name Oliver Douglas and the other the name Russell Briskie. Defendant Croucher demanded that plaintiff unlock and open the briefcase so he could search it, but plaintiff refused to do so, stating that the deputy sheriffs had no warrant or probable cause to search the briefcase. At some point, plaintiff's deposit bag was opened and searched without a warrant and without plaintiff's consent.[3]

Defendants Nitcher and Manning were on duty at the jail when defendant Croucher arrived with plaintiff. They attempted to photograph plaintiff and take his finger-prints, as required according to jail policy for all persons booked into jail.[4] Plaintiff refused, stating that he was not subject to K.S.A. 21–2501, the Kansas statute requiring fingerprinting of persons under certain circumstances. Defendants Nitcher and Manning threatened plaintiff with a charge of obstructing legal process if he refused to submit to their requests. However, plaintiff continued to refuse. Plaintiff also refused to don the standard orange jumpsuit worn by jail inmates because the garment contained synthetic fibers, explaining that his religion permitted him to wear only clothes made of natural fibers. Defendants did not force plaintiff to be fingerprinted or photographed or to wear the standard jail attire.

Upon his admission into jail, plaintiff immediately informed his jailers that his religion required a strict diet, which prohibited such foods as meat containing fat and pasteurized, homogenized milk. He also insisted that he was permitted to drink only distilled water. He subsequently submitted a written request to Sheriff Ordonez regarding his religious diet, listing citations to numerous biblical passages. Plaintiff's family offered to provide him with food, but defendants did not permit them to do so for security and health reasons.

Plaintiff repeatedly asked to use the telephone. At approximately 11 p.m., plaintiff was permitted to make a phone call. He placed a call to his brother for the purpose of seeking legal advice. Without plaintiff's knowledge, the call was surreptitiously recorded by the defendants.

Still wearing his own clothes, plaintiff was placed in a cell in the detoxification center of the Osage County jail,[5] where he remained until late in the afternoon of the next day. Because the detoxification cell was not furnished with a mattress, chair, or even a pillow, plaintiff was required to sleep on the

---

**3.** Although the defendants contend there is no evidence in the record to support this assertion, the court infers from the undisputed facts that the zippered deposit bag was opened and searched, either at the scene or after plaintiff arrived at the jail.

**4.** Apparently the entire booking procedure was recorded on videotape. Although both parties refer to the videotape, it has not been filed as part of the record, and therefore it is not available to the court for purposes of resolving the parties' motions for summary judgment.

**5.** The evidence in the record indicates that Osage County jail has a normal bed capacity of 21, with two holding cells and a detoxification center. The jail was opened in 1985.

resilient raised floor of the cell. Plaintiff had previously incurred a back injury in a work-related accident and consequently had chronic back problems,[6] which were exacerbated by sleeping without a mattress. Defendants Manning and Nitcher called plaintiff's doctor on the night of his arrest and were informed about plaintiff's back disorder.

On the night of his arrest, without the knowledge or consent of the plaintiff, defendant Croucher unsuccessfully attempted to open the combination lock of plaintiff's briefcase. He contacted the Osage County Attorney to ask how he could legally search the briefcase. He was advised to prepare an affidavit for a search warrant, and in the meantime contact the Tri–County Drug Enforcement Unit to have the briefcase checked by a dog trained to alert to the presence of drugs. Upon doing so, the dog alerted to the briefcase.

On Sunday, the following day, defendant Croucher obtained a search warrant and proceeded to forcibly open the briefcase. The contents of the briefcase included a specimen bottle containing seeds, a single clear capsule containing white powder, and a syringe. These items were sent to the Kansas Bureau of Investigation Laboratory for analysis.[7]

In the meantime, the County Attorney received computer information from the state of Virginia indicating that Fillmore's Virginia driver's license had been suspended. On Monday, December 9, after conferring with Deputy Sheriffs Croucher, Manning, and Nitcher, the County Attorney charged plaintiff with one count of speeding in violation of K.S.A. 8–1336, one count of driving with a suspended driver's license in violation of K.S.A. 8–262(a), one count of driving without his driver's license on his person in violation of K.S.A. 8–244, and two counts of obstructing official duty in violation of K.S.A. 21–3808. One of the obstruction counts in the

complaint was based upon plaintiff's failure to respond to defendant Croucher's questions concerning his driver's license, and the other on his refusal to be fingerprinted and photographed and to change into jail clothing upon being booked into jail.

Plaintiff was transferred to a regular cell on the afternoon of Sunday, December 8. He requested a thicker mattress because of his back problems, contending that the regular mattress was hard and lumpy. Initially he was told that no other mattresses were available. However, on December 11, the day after he submitted a formal administrative demand, he was provided a better mattress. Defendants refused to permit plaintiff's family to provide a mattress for him to use while he was detained in jail.

Each cell in the jail is equipped with an electronic communication and surveillance system which emits a soft beep every six seconds. A low-intensity light burns at all times, day and night. For safety and security reasons, inmates do not have the option of turning off either the beeper system or the light. The beeper and light disturbed plaintiff's sleep. Defendant Ordonez denied plaintiff's demand to have the ability to turn out the light.

While detained in jail, plaintiff was provided the meals normally served to jail inmates. He refused to eat the foods proscribed by his religious diet. Defendant Dunn, the deputy sheriff in charge of the jail, received plaintiff's request for compliance with his religious diet on Monday, December 9, her first day on duty since plaintiff had been detained. Defendant Ordonez was also aware of plaintiff's request. On December 9, Defendant Dunn asked plaintiff the nature of his religion.[8] On December 10, plaintiff submitted a formal administrative demand for compliance with his religious diet. On December 11, he submitted a formal demand for enough food to

---

**6.** Defendants have stipulated that plaintiff was injured in an accident on or about January 17, 1989, in which he incurred a compression fracture of the second lumbar vertebra. According to the evidence, plaintiff receives disability payments from a private disability insurance carrier, presumably as a result of the accident.

**7.** For reasons not explained by the record, plaintiff was not charged with any drug offense. The laboratory analysis report received several weeks later, following plaintiff's trial, revealed that the items submitted did not contain any controlled substances.

**8.** Plaintiff's affidavit states that he is a Hebrew and a member of the House of Israel.

sustain life. Nothing was done to comply with plaintiff's religious diet until the noon meal on Wednesday, December 11, when jail personnel began to provide him with additional servings of food on the regular menu that were not prohibited by his religious diet. On December 11 defendant Dunn supplied plaintiff with distilled water for the first time. By the evening meal on December 11, plaintiff was satisfied he was being fed sufficiently. Because plaintiff was provided inadequate amounts of foods permitted by his religious diet, he contends he was inadequately nourished for the first four days of his detention, prior to December 11.

On the evening of December 9, prior to the appointment of counsel to assist him, plaintiff submitted a written request to the Osage County Sheriff asking for a long list of legal materials. He was provided all of the Kansas statutes he requested, and photocopies of Kansas regulations he requested. Defendants did not supply the other requested legal materials because they were unavailable to the Sheriff's Office in Osage County. Plaintiff was provided all requested legal materials that were readily available to the Osage County Sheriff's Office.[9] However, he was not provided access to a law library. Plaintiff did not request his assigned counsel to provide him with any legal materials on or after his appointment on December 11.

During his detention, plaintiff's request for physical contact with his visitors was denied. Just before he was released, he submitted a request to examine the contents of his jail record. However, he was released before the defendants had an opportunity to comply with this request. After his release, the plaintiff was notified that he could look at the file.

Plaintiff was permitted to make telephone calls to individuals of his own choosing seeking legal counsel, although some of his phone calls were limited in duration and plaintiff later learned that at least some of his calls

had been monitored. On one occasion, either defendant Dunn or defendant Nitcher monitored a telephone call plaintiff made to another member of his family for the purpose of seeking legal advice concerning searching and censoring inmate mail. On another occasion, defendant Fozdick intentionally monitored one of plaintiff's telephone calls seeking legal advice from George Gordon.[10]

On the evening of December 11, plaintiff fell to the floor while he was stepping out of the shower in his cell. He hurt his back when he fell, and consequently experienced severe pain. Plaintiff asked to be taken to Newman Memorial Hospital in Emporia. He was transported there by ambulance. Defendant Fozdick drove his patrol car to the hospital and was present when the ambulance arrived. Plaintiff was x-rayed and examined by a physician, who determined that he had possibly sprained his back. Plaintiff refused a shot for his pain. The physician, Dr. Devinder Kumar, diagnosed no significant injury and saw no reason to admit plaintiff to the hospital. Dr. Kumar wrote plaintiff a prescription for pain relief and released him for return to the jail.

While defendant Fozdick was dressing plaintiff for the return trip, plaintiff cried out in pain and begged Fozdick to stop. After plaintiff was dressed, defendant Fozdick placed plaintiff in a seated position in a wheel chair. Dr. Kumar directed that plaintiff be transported back to the jail in a manner that would not cause him pain. Although plaintiff asked to be returned to jail in either a van or an ambulance in which he could lie flat, defendant Fozdick required him to sit up on the seat of the patrol car.

Plaintiff's first appeared before a judge on Monday, December 9. No probable cause determination was made by the court at this proceeding. The court offered to release plaintiff on his own recognizance, but plaintiff refused to agree to post a cash bond for

9. Although the county has a law library, defendant Ordonez asserted at his deposition that the state district judges have denied the sheriff access to the county law library.

10. Plaintiff has identified Gordon as a Missouri law professor who is the founder of the George

Gordon School of Common Law. Plaintiff told defendant Dunn, the deputy sheriff in charge of the jail, that he wanted to speak with Gordon in order to prepare his defense and to ascertain his legal rights as a detainee.

religious reasons. The court appointed legal counsel to assist plaintiff at his arraignment on Wednesday, December 11. After a number of communications between plaintiff and the court, a bond was eventually approved on the morning of December 12, 1991, resulting in plaintiff's immediate release from detention on his own recognizance.

Plaintiff was tried on January 21, 1992. Just before trial, the court granted plaintiff's motion to dismiss, as a matter of law, the two obstruction charges. The case proceeded to trial on the remaining counts. The state dismissed the count charging plaintiff with driving with a suspended driver's license because the prosecutor lacked the necessary documentation from the state of Virginia. Plaintiff was convicted by the court of the speeding charge and the charge of driving without having his driver's license in his possession. He was fined a total of $118 and ordered to pay court costs. His convictions were affirmed by the Kansas Court of Appeals, and the Kansas Supreme Court denied plaintiff's petition for review. *See State v. Fillmore,* Case No. 92–68086–A (Kan.Ct.App. March 19, 1993) [849 P.2d 150 (table) ] (unpublished opinion), *rev. denied* (May 7, 1993).

The parties have stipulated that defendant Ordonez was the duly elected sheriff of Osage County at all relevant times, and as such had the jurisdiction and duty to maintain the Osage County jail.[11] In addition, the parties agree that the defendants at all relevant times were acting in their respective capacities as law enforcement officers under color of state law. Defendant Croucher was authorized to enforce the Traffic Code of the State of Kansas, as well as other laws. Defendant Dunn served as jail sergeant in charge of the jail, and defendants Manning, Nitcher, and Fozdick served as jailers.

### Analysis

Plaintiff brings his claims against the defendants pursuant to 42 U.S.C. § 1983, which reads in relevant part:

11. *See* K.S.A. 19–811.

12. Although the issue has not been raised by the parties, the court notes that plaintiff's claim un-

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... for redress.

The Tenth Circuit Court of Appeals recently had occasion to discuss the breadth of § 1983 in a wrongful death action brought against a sheriff and deputy sheriff:

A word is called for about the breadth of § 1983. The law creates no rights and is not a carte blanche statute authorizing recovery for negligence or other common law torts standing by themselves. Indeed, in order to recover in federal court through § 1983 a plaintiff must show: (1) a federal constitutional right was violated; and (2) the individual violating the constitutional right did so under color of law. The civil rights law is not a general tool to discipline local law enforcement officers.... We are interested in whether the Sheriff's Deputy abused his "official power" by his allegedly negligent conduct.

*Quezada v. County of Bernalillo,* 944 F.2d 710, 714 (10th Cir.1991) (citations omitted).

A *pro se* litigant's pleadings are to be construed liberally. *Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972); *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir.1991); *Meade v. Grubbs,* 841 F.2d 1512, 1526 (10th Cir.1988). Nevertheless, it is not the function of the district court to assume the role of advocate for the *pro se* litigant. *Hall v. Bellmon,* 935 F.2d at 1110.

### I. *Official–Capacity Claims Against Defendant Ordonez*

Plaintiff asserts two claims against Sheriff Ordonez solely in his official capacity: unlawful imprisonment in violation of the Fifth and Fourteenth Amendments,[12] and de-

der § 1983 that his liberty was denied without due process by unlawful imprisonment may arguably be precluded by virtue of the fact that he has an adequate post-deprivation remedy under

nial of his right to counsel under the Sixth and Fourteenth Amendments.[13]

■ A suit against a government officer in his official capacity is not a suit against the individual, but rather against the official's office. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 165–68, 105 S.Ct. 3099, 3104–3106, 87 L.Ed.2d 114 (1985) (distinguishing official-capacity suits from personal-capacity suits). Local officials may be sued in their official capacities under § 1983 if the action alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy. *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690 & n. 55, 98 S.Ct. 2018, 2035 & n. 55, 56 L.Ed.2d 611 (1978). A local government official may also be sued in his official capacity for a constitutional deprivation based upon a governmental "custom," even if such custom has not been officially approved through the local government's official decision-making channels. *Id.* at 690–91, 98 S.Ct. at 2035–36.

■ However, a local official sued in his official capacity cannot be held liable unless the constitutional deprivation occurs pursuant to official municipal policy; hence, a local official cannot be held liable under § 1983 solely on the theory of *respondeat superior. Id.* at 691, 98 S.Ct. at 2036; *Kaiser v. Lief,* 874 F.2d 732, 736 (10th Cir.1989). Municipalities and their supervisory personnel are not liable for civil rights violations caused by individual law enforcement officers unless the plaintiff demonstrates an affirmative causal link between the misconduct of the officer and the adoption of a plan or policy showing authorization or approval of such misconduct. *See D.T. by M.T. v. Independent School District No. 16,* 894 F.2d 1176, 1187 (10th Cir.) (quoting *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976)), *cert. denied,* 498 U.S. 879, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990). It is the plaintiff's obligation to prove the direct nexus between the alleged constitutional torts and the official authorization or approval thereof by adoption of a plan or policy. *Id.* at 1187.

Plaintiff has presented no evidence whatsoever to demonstrate that he was detained in jail or denied counsel as a result of any local policy, regulation, ordinance, custom, or plan to the extent that Sheriff Ordonez may be held liable under § 1983 in his official capacity. On his unlawful imprisonment claim, plaintiff simply alleges that defendant Ordonez held him in custody between the time of his arrest on December 7 and his release on December 12. Surely plaintiff does not claim that Sheriff Ordonez did so in accordance with a local custom or policy of unlawfully detaining arrestees. On his claim that his right to counsel was denied, he contends that at least three of his telephone calls seeking legal advice were monitored by some of the defendant deputy sheriffs. He does not contend that the claimed deprivation was caused by execution of any official county policy or custom. In fact, the evidence indicates that jail policy *precluded* the monitoring of telephone conversations between inmates and their legal counsel.[14] While Kansas law vests the sheriff with the "final authority" to establish jail policies on behalf of county govern-

---

Kansas tort law for false imprisonment. *See Zinermon v. Burch,* 494 U.S. 113, 132, 110 S.Ct. 975, 986, 108 L.Ed.2d 100 (1990); *Alvarado v. City of Dodge City,* 238 Kan. 48, 708 P.2d 174, 179–80 (1985); *Massey v. Shepack,* 12 Kan. App.2d 770, 757 P.2d 329, 330, 332–33 (1988). Because the court has disposed of plaintiff's claim of unlawful detention on other grounds, however, it is unnecessary to address this issue.

**13.** It is not entirely clear whether plaintiff is suing any of the other defendants in their official capacities or solely in their personal capacities. However, even if it was the plaintiff's intent to sue the deputy sheriffs in their official capacities,

he has not presented sufficient evidence to render the municipality liable under § 1983, for the same reasons discussed in the text with regard to his official-capacity claims against Sheriff Ordonez.

**14.** Inmates were left alone in the booking room to make legal telephone calls. However, it was possible to overhear the inmate's side of the conversation by means of a microphone in the booking room that was connected to a speaker in the adjoining office. The purpose of the surveillance system was not to monitor such calls, however, but to ensure security in the booking room.

ment, *see* K.S.A. 19–811; *see also Jantz v. Muci,* 976 F.2d 623, 630 (10th Cir.1992), *cert. denied,* ——— U.S. ———, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993), no evidence has been advanced that any such policy was the basis of the challenged conduct.

Nor does plaintiff contend that Sheriff Ordonez is liable in his official capacity as a result of improperly training and supervising his deputy sheriffs so as to demonstrate deliberate indifference to constitutional rights. *See City of Canton v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 1204–1205, 103 L.Ed.2d 412 (1989); *Ware v. Unified School Dist. No. 492,* 902 F.2d 815, 819 (10th Cir. 1990); *Schepp v. Fremont County,* 900 F.2d 1448, 1454 (10th Cir.1990). The court will therefore grant summary judgment as a matter of law to defendant Ordonez on plaintiff's two claims asserted against him in his official capacity as the Sheriff of Osage County.[15]

## II. *Personal–Capacity Claims*

■ Each of plaintiff's other claims is asserted against one or more of the defendants acting in their personal capacities. *See Kentucky v. Graham,* 473 U.S. at 166, 105 S.Ct. at 3105. To establish personal liability in a § 1983 claim, it is enough to show that the official, acting under color of state law, caused the deprivation of the federal right. *Id.* (citing *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). Unlike an official-capacity action, however, the defendant answering a personal-capacity claim may assert personal immunity defenses such as qualified immunity. *Id.* 473 U.S. at 166–67, 105 S.Ct. at 3105. "A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him." *Id.* at 167–68, 105 S.Ct. at 3106. Further, plaintiff may recover punitive damages if he successfully sues the defendants personally. *See id.* at 167 n. 13, 105 S.Ct. at 3106 n. 13 (citing *Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983)). The court will address each of the plaintiff's personal-capacity claims separate-

ly, and to the extent necessary, the defense of qualified immunity asserted by all of the defendants as to each of the claims.

### A. *Unlawful Arrest*

■ Plaintiff asserts that defendant Croucher unlawfully arrested him in violation of his Fourth Amendment rights. Plaintiff contends that defendant Croucher had no authority to arrest him for invoking his Fifth Amendment right to refrain from making self-incriminating statements in response to defendant Croucher's questions, and that he therefore lacked probable cause for the warrantless arrest. In response, defendant argues that plaintiff was arrested not only for refusing to answer questions but also for driving without a driver's license in his possession, which defendant contends is an arrestable offense under Kansas law. Defendant Croucher also argues that he had probable cause to arrest plaintiff, reasoning that unless probable cause is absent, plaintiff has no claim for unlawful arrest.

■ Plaintiff is correct in arguing that he had a constitutional right under the Fifth and Fourteenth Amendments to refuse to respond to defendant Croucher's question concerning the possibility that his driving privileges had been suspended. He also correctly argues that the exercise of his constitutional right to remain silent cannot be converted into a criminal offense such as obstructing legal process or official duty. *See State v. Lee,* 242 Kan. 38, 744 P.2d 845, 849 (1987); *State v. Parker,* 236 Kan. 353, 690 P.2d 1353, 1363 (1984); *cf. Miller v. United States,* 230 F.2d 486, 490 (5th Cir.1956) (refusing to permit warrantless search of defendant's home cannot be prosecuted as obstructing marshal in serving subpoena on another person in defendant's home). Hence defendant Croucher did not, as a matter of law, have probable cause to arrest plaintiff for obstructing official duty pursuant to K.S.A. 21–3808.

---

**15.** Even if plaintiff had presented sufficient evidence to withstand summary judgment on his claims against defendant Ordonez in his official capacity, he would not be entitled to recover punitive damages on these claims. *See City of*

*Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271, 101 S.Ct. 2748, 2762, 69 L.Ed.2d 616 (1981) (municipalities are absolutely immune from punitive damages under § 1983).

However, plaintiff admitted to defendant Croucher at the time of the traffic stop that he had no driver's license. He does not contest defendant Croucher's assertion on summary judgment that he was also arrested for failing to display a driver's license. Instead, he argues that driving without a driver's license in his possession is not an offense justifying arrest under Kansas law.

K.S.A. 22–2401 authorizes arrests under several specified circumstances:

A law enforcement officer may arrest a person under any of the following circumstances:

.    .    .    .    .

(c) The officer has probable cause to believe that the person is committing or has committed:

(1) A felony; or

(2) a misdemeanor, and the law enforcement officer has probable cause to believe that:

(A) The person will not be apprehended or evidence of the crime will be irretrievably lost unless the person is immediately arrested;

(B) the person may cause injury to self or others or damage to property unless immediately arrested; or

(C) the person has intentionally inflicted bodily harm to another person.

(d) Any crime, except a traffic infraction, has been or is being committed by the person in the officer's view.

Defendant correctly contends that plaintiff was lawfully arrested under subsection (d) of K.S.A. 22–2401. Plaintiff told defendant Croucher he had no driver's license. Plaintiff therefore committed the criminal offense of operating a vehicle without a driver's license in defendant Croucher's view. The offense of driving without a driver's license is not among those categorized as "traffic infractions" under Kansas law. *See* K.S.A. 21–3105(2); K.S.A. 8–2118(c). Therefore, defendant Croucher had the authority under Kansas law to arrest plaintiff when he admitted he carried no driver's license.

Probable cause to arrest exists if the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense. *E.g., Jones v. City and County of Denver,* 854 F.2d 1206, 1210 (10th Cir. 1988) (citations omitted). Based upon the information available to defendant Croucher at the time of the arrest, he had probable cause to arrest plaintiff for either K.S.A. 8–244 (driving without a license on his person), an unclassified misdemeanor, or K.S.A. 8–235(a) (driving without having been issued a driver's license), a class B misdemeanor.[16]

Absence of probable cause is an essential element of plaintiff's § 1983 claim for unlawful arrest. *See, e.g., Karr v. Smith,* 774 F.2d 1029, 1031 (10th Cir.1985); *Elbrader v. Blevins,* 757 F.Supp. 1174, 1178 (D.Kan. 1991). Although defendant Croucher may not have had probable cause to arrest plaintiff on the charge of obstructing the performance of his official duties, the fact that he had probable cause to arrest plaintiff for the driver's license offense precludes liability under § 1983 for unlawful arrest. *See id.* at 1179 (citing *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1080 (8th Cir.1990)). Defendant Croucher's subjective reason for making the arrest is irrelevant to the determination of whether plaintiff's Fourth Amendment rights were violated. *Foster,* 914 F.2d at 1079; *Linn v. Garcia,* 531 F.2d 855, 862 (8th Cir.1976).

The court finds unpersuasive plaintiff's argument that defendant Croucher should have exercised his discretion in favor of releasing plaintiff after requiring him to sign a traffic citation. The statute upon which plaintiff relies for this argument, K.S.A.1992 Supp. 8–2104, by its terms applies only to violations of the Uniform Act Regulating Traffic on Highways ("Uniform Act"). While plaintiff was initially stopped for speeding, his arrest was not based upon a violation of the Uniform Act. Thus K.S.A.

---

**16.** Information concerning plaintiff's suspended Virginia driver's license was not available to defendant Croucher at the time of the arrest. Hence he had no probable cause at that time to arrest plaintiff for driving with a suspended driver's license in violation of K.S.A. 8–262.

1992 Supp. 8–2104 has no application to plaintiff's unlawful arrest claim.

Since plaintiff has presented no evidence that would permit a reasonable juror to believe that defendant Croucher lacked probable cause to make the arrest, the court will grant summary judgment in favor of defendant Croucher on plaintiff's claim of unlawful arrest.

## B. *Unlawful Seizure of Briefcase and Deposit Bag*

Plaintiff claims that defendant Croucher violated his Fourth, Fifth, and Fourteenth Amendment rights by unlawfully seizing his locked briefcase and zippered deposit bag from his truck following his arrest. Plaintiff claims that defendant Croucher lacked probable cause to believe that either the briefcase or the deposit bag contained contraband. Defendant Croucher concedes that he removed the briefcase and deposit bag from the truck. He contends that he did so for security reasons to keep them from being stolen, since the truck was to be left at the side of the highway after dark. Defendant Croucher contends that his search of the truck was justified as a search incident to plaintiff's arrest.

■ In *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), the Supreme Court established a "bright line" test permitting a vehicle search incident to a lawful custodial arrest. *Michigan v. Long,* 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 3481 n. 14, 77 L.Ed.2d 1201 (1983). "[W]hen a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Belton,* 453 U.S. at 460, 101 S.Ct. at 2864. Further, *Belton* authorized the police to examine the contents of any containers found in the passenger compartment, on the reasoning that the lawful custodial arrest justifies the infringement of

the arrestee's privacy. *Id.* at 460–61, 101 S.Ct. at 2864. In this case, defendant Croucher searched the interior of the truck just after he arrested plaintiff, and the scope of the search did not exceed the interior passenger area of the truck. The court therefore concludes that defendant Croucher's search of the truck did not amount to a deprivation of plaintiff's Fourth Amendment rights.

■ However, *Belton* does not legitimize the warrantless seizure of an arrestee's personal property. At the time of the seizure, defendant Croucher had no basis for believing that either the locked briefcase or the deposit bag contained weapons or contraband.[17] *See Soldal v. Cook County, Ill.,* —— U.S. ——, ——, 113 S.Ct. 538, 547, 121 L.Ed.2d 450 (1992) (plain view cases clearly state that such seizures are reasonable only because there is probable cause to associate the seized property with criminal activity). Nevertheless, *Belton* would have authorized defendant Croucher to search the containers in the truck as part of the search incident to the custodial arrest, whether or not he had probable cause to suspect that the containers concealed contraband.

No authority is cited in support of defendant's argument that the seizure was justified to prevent plaintiff's property from being stolen from the truck. Although the court believes that defendant Croucher acted reasonably under the circumstances to protect plaintiff's briefcase and deposit bag from theft, the court knows of no law permitting law enforcement officers to effect a protective seizure of an arrestee's personal property absent consent. Defendant Croucher concedes that he did not impound the truck; nor did he perform an inventory search of the truck's contents. There is no evidence in the record to support defendant's argument that plaintiff voluntarily consented to the seizure.

■ The court therefore concludes that defendant Croucher violated plaintiff's rights

---

17. In his deposition, defendant Croucher stated that his suspicion that the briefcase contained contraband was based upon the large sum of cash plaintiff had on his person, the fact that he had "no visible means of support," and his reluctance to open the briefcase. According to the record, however, defendant Croucher would

have had no basis for drawing these conclusions until plaintiff was booked into jail, well after he seized the briefcase from the truck. Whether defendant Croucher had probable cause to seize plaintiff's personal property must of course be analyzed on the basis of the information he possessed at the time of the seizure.

by seizing the briefcase and the deposit bag from the truck without a warrant and without probable cause that they contained evidence of a crime. The court further holds that plaintiff has met his burden of showing that the law he alleges defendant Croucher violated in seizing his property was clearly established at the time of the seizure. *See United States v. Place,* 462 U.S. 696, 708, 103 S.Ct. 2637, 2645, 77 L.Ed.2d 110 (1983) (taking custody of suitcase deemed unlawful seizure); *see also United States v. MacDonald,* 670 F.2d 910, 914 (10th Cir.) (so long as they reasonably suspect baggage contains contraband, police may temporarily detain or move it to permit examination by drug-detecting dog without violating Fourth Amendment), *cert. denied,* 459 U.S. 1015, 103 S.Ct. 373, 74 L.Ed.2d 508 (1982).

■ Nevertheless, the defendant is entitled to qualified immunity, because the court concludes that a reasonable officer, given the information available to defendant Croucher at the time, would have believed his actions to be lawful. *See Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).[18] The court will therefore grant summary judgment to defendant Croucher on plaintiff's claim that his briefcase and deposit bag were seized unlawfully.

### C. *Unlawful Search of Briefcase*

■ Plaintiff also argues that defendant Croucher unlawfully opened and searched his briefcase after plaintiff was booked into Osage County jail, in violation of his Fourth and Fourteenth Amendment rights.[19] He claims that the defendant improperly subjected the briefcase to a sniff-search in order to establish probable cause to forcibly open and search it. He also contends that the defendant secured the warrant on the basis of misrepresentations in the supporting affidavit.[20]

■ Subjecting personal baggage to a canine sniff for narcotics is not a "search" within the meaning of the Fourth Amendment. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 2644, 77 L.Ed.2d 110 (1983) (luggage); *United States v. MacDonald,* 670 F.2d at 914 (luggage); *United States v. Burns,* 624 F.2d 95, 101 (10th Cir.) (locked briefcase), *cert. denied sub nom. Reynolds v. United States,* 449 U.S. 954, 101 S.Ct. 361, 66 L.Ed.2d 219 (1980); *United States v. Germosen–Garcia,* 712 F.Supp. 862, 865–66 (D.Kan.1989) (luggage); *see also United States v. Morales–Zamora,* 914 F.2d 200, 203–04 (10th Cir.1990) (sniff of vehicle lawfully detained at roadblock). The defendant therefore did not violate plaintiff's rights by the act of subjecting the briefcase to a sniff-search.

■ Once the dog alerted to the briefcase, defendant Croucher had probable cause to obtain a warrant to authorize its search.

18. The issue of qualified immunity, while fact-specific, is generally to be decided by the court as a matter of law in advance of trial. *See, e.g., Gallegos v. City and County of Denver,* 984 F.2d 358, 361–62 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 2962, 125 L.Ed.2d 662 (1993). The court finds that there is an adequate factual basis in the record to resolve the issue on summary judgment.

19. Although plaintiff also contends that the zippered deposit bag was opened and searched unlawfully, this claim was not preserved in the pretrial order. The court notes, however, that under *Belton* defendant Croucher had the right to open and search the deposit bag at the time he searched the truck incident to plaintiff's arrest. The plaintiff does not allege when the bag was searched.

20. Further, plaintiff accuses defendant Croucher of collusion in setting up the sniff-search to yield positive results by such actions as rubbing marijuana on the outside of the briefcase or lying by agreement with the dog handler. Since there is absolutely no evidence in the record to support plaintiff's accusations, the court will not consider or address them.

Plaintiff also accuses the state magistrate judge who authorized the search warrant of doing so out of prejudice against him and his brother as a result of another legal proceeding in which they had been previously involved before the same judge. However, the plaintiff has not named the judge as a defendant in this case. Even if he had, the judge is entitled to absolute immunity from § 1983 liability for his judicial actions, as long as they were not taken in the clear absence of all jurisdiction. *See Stump v. Sparkman,* 435 U.S. 349, 356–57, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 331 (1978); *Pierson v. Ray,* 386 U.S. 547, 553–55, 87 S.Ct. 1213, 1217–18, 18 L.Ed.2d 288 (1967).

*See, e.g., United States v. Morales–Zamora,* 914 F.2d at 205 (probable cause to search was supplied when dog alerted to vehicle); *United States v. Meyer,* 536 F.2d 963, 966 (1st Cir.1976) (positive reaction by trained narcotics dog provided basis upon which magistrate could reasonably conclude there was probable cause to search for narcotics). Furthermore, the fact that laboratory results ultimately revealed that the items contained in the plaintiff's briefcase did not contain controlled substances does not negate the effect of the positive alert for probable cause purposes. *See United States v. Germosen–Garcia,* 712 F.Supp. at 865 n. 1 (citing *United States v. Massac,* 867 F.2d 174, 176 n. 2 (3d Cir.1989)). Therefore, even though defendant Croucher may have added misleading assertions to the affidavit in support of the search warrant, the court concludes that the warrant would have been lawfully obtained even without the surplusage.

Consequently, the court concludes that the plaintiff has no claim against defendant Croucher on the basis of the search of his briefcase. Because the defendant did not as a matter of law violate plaintiff's rights in searching his briefcase, defendant Croucher is entitled to summary judgment on this claim.

### D. *Malicious Prosecution*

Plaintiff contends that defendants Ordonez, Nitcher, and Manning violated plaintiff's due process rights under the Fifth and Fourteenth Amendments by prosecuting him for obstruction of official duty under K.S.A. 21–3808 based upon his refusal to submit to fingerprinting. He argues that he was not required to submit to fingerprinting by the terms of K.S.A. 21–2501. Further, he argues that the fact that the charge was dismissed in a pretrial motion hearing in response to plaintiff's motion to dismiss is *res judicata* as to the issue of whether the defendants had probable cause to charge plaintiff with the offense. He further contends that Sheriff Ordonez has established a jail policy requiring all arrestees to be fingerprinted upon admission to the jail, regardless of the nature of the charges against them.

Defendants argue they had probable cause to charge plaintiff with obstruction, thereby negating his charge of malicious prosecution. Further, they contend that they did not make the decision to prosecute plaintiff; they simply told the County Attorney what they knew, and she alone made the decision to prosecute and selected the particular criminal charges against plaintiff. Finally, they contend that Sheriff Ordonez was not on duty until December 9 and therefore did not participate in the prosecution of the plaintiff.

Freedom from malicious prosecution is a federal right protected by § 1983. *Sanders v. English,* 950 F.2d 1152, 1159 (5th Cir.1992) (citing *Hand v. Gary,* 838 F.2d 1420, 1427 (5th Cir.1988)); *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1563 (11th Cir.1990); *Strength v. Hubert,* 854 F.2d 421, 425–26 (11th Cir.1988); *see Anthony v. Baker,* 767 F.2d 657, 662–63 (10th Cir.1985). Prosecutors themselves are absolutely immune from liability under § 1983 for their conduct in initiating a prosecution and in presenting the state's case, since that conduct is considered to be intimately associated with the judicial phase of the criminal process. *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 994–95, 47 L.Ed.2d 128 (1976). Nevertheless, a prosecutor's decision to charge will not shield a law enforcement officer whose misconduct influences the prosecutor's decision. *See Robinson v. Maruffi,* 895 F.2d 649, 656 (10th Cir.1990). " 'If police officers have been instrumental in the plaintiff's continued confinement or prosecution, they cannot escape liability by pointing to the decisions of prosecutors or grand jurors or magistrates to confine or prosecute him.' " *Id.* (quoting *Jones v. City of Chicago,* 856 F.2d 985, 993 (7th Cir.1988)). The decision to prosecute plaintiff for obstruction of official duty for refusing to be fingerprinted was clearly influenced by the reports Manning and Nitcher submitted to the County Attorney regarding plaintiff's lack of cooperation during the booking process. Consequently, the court is not persuaded by defendants' arguments that the County Attorney was solely responsible for prosecuting the plaintiff.

Nor is the court persuaded by the argument advanced by defendant Ordonez that he was not on duty until December 9

and therefore did not participate in the decision to prosecute. It is undisputed that Ordonez, as Sheriff, was the supervisor of defendants Nitcher and Manning, and was statutorily responsible for their acts. A sheriff may be held personally liable under § 1983 for the acts of his deputies for whom he was responsible if he knew or should have known of the conduct, yet failed to prevent future harm. *Anthony v. Baker,* 767 F.2d at 666 (citing *McClelland v. Facteau,* 610 F.2d 693 (10th Cir.1979)). Defendant Ordonez was on duty on December 9, 1991, the day the complaint was filed. He therefore should have known of his deputies' reports concerning the obstruction charge and could have taken action to prevent plaintiff from being charged.

■ Nevertheless, not every unfounded or malicious prosecution is actionable under § 1983, particularly if state remedies are available to the aggrieved party. *Anthony v. Baker,* 767 F.2d at 662. However, if the misuse of legal procedure is so egregious as to subject the aggrieved person to a deprivation of constitutional dimension, and the tortfeasor acts under color of state law, § 1983 may be employed as a remedy. *Id.* at 663 (quoting *Norton v. Liddel,* 620 F.2d 1375, 1378–79 (10th Cir.1980)); *Lusby v. T.G. & Y. Stores, Inc.,* 749 F.2d 1423, 1431 (10th Cir. 1984) (misuse of legal procedure must be so egregious as to amount to violation of plaintiff's due process rights) (citing *Norton v. Liddel,* 620 F.2d at 1378), *cert. granted and judgment vacated in part sub nom. City of Lawton, Okla. v. Lusby,* 474 U.S. 805, 106 S.Ct. 40, 88 L.Ed.2d 33 (1985), *on remand,* 796 F.2d 1307 (10th Cir.), *cert. denied,* 479 U.S. 884, 107 S.Ct. 275, 93 L.Ed.2d 251 (1986).

■ In order to prove a § 1983 claim for malicious prosecution, plaintiff must begin by establishing the elements required under state law. In Kansas, the elements of a claim for malicious prosecution are: (1) the defendant initiated, continued, or procured

civil or criminal proceedings against plaintiff; (2) in so doing the defendant acted without probable cause; (3) the defendant acted with malice; (4) the proceeding terminated in favor of plaintiff; and (5) plaintiff sustained damages as a result. *See Tappan v. Ager,* 599 F.2d 376, 378 (10th Cir.1979); *Crow v. United States,* 659 F.Supp. 556, 571 (D.Kan. 1987); *Nelson v. Miller,* 227 Kan. 271, 607 P.2d 438, 443 (1980); *Braun v. Pepper,* 224 Kan. 56, 578 P.2d 695, 698 (1978).

■ The plaintiff carries the burden of establishing the absence of probable cause for instituting the criminal proceeding, by proving that there were no reasonable grounds for suspicion supported by circumstances sufficient to warrant a prudent man in believing the plaintiff committed the act for which he was charged. *See Patton v. Guyer,* 443 F.2d 79, 85 (10th Cir.1971); *see also Rouse v. Burnham,* 51 F.2d 709, 710 (10th Cir.1931); *Elbrader v. Blevins,* 757 F.Supp. at 1178–79; *Glassey v. Ramada Inn,* 5 Kan.App.2d 121, 612 P.2d 1261, 1263 (1980).

■ Plaintiff argues that the pretrial dismissal of the charge of obstructing official duty is controlling on the issue of whether the defendants lacked probable cause to prosecute plaintiff for that charge.[21] However, the dismissal of the charge upon which plaintiff grounds his malicious prosecution claim actually *establishes* only that the proceedings on that particular claim were terminated in plaintiff's favor. While this is an essential element of a state tort law claim for malicious prosecution, it is not sufficient by itself to establish plaintiff's § 1983 claim, which requires a deprivation of *constitutional* dimension. Furthermore, the termination of a proceeding by a competent tribunal adverse to the party initiating it is not conclusive evidence the proceeding was brought without probable cause so as to support a claim of malicious prosecution. *Sampson v. Hunt,* 233 Kan. 572, 665 P.2d 743, 753 (1983).[22]

---

**21.** The court rejects defendant's argument that the state court determined there was probable cause, thereby precluding liability for malicious prosecution. In fact, the journal entry of conviction filed in state court on February 11, 1992, clearly shows that the district judge lined out the

words "the State has probable cause," and he initialled the deletion.

**22.** The courts have held that a plaintiff is collaterally estopped from asserting absence of probable cause if the arrestee has contested probable

■ Plaintiff was charged with violating K.S.A. 21–3808, which reads in relevant part:

Obstructing legal process or official duty is knowingly and willfully obstructing, resisting or opposing any person authorized by law to serve process in the service or execution or in the attempt to serve or execute any writ, warrant, process or order of the court, or in the discharge of any official duty.

The Kansas courts have interpreted the statute broadly to include the willful obstruction of an officer, while acting in the discharge of his official duty, by any means, including mere words. *See, e.g., State v. Lee,* 242 Kan. 38, 744 P.2d 845, 847–48 (1987); *State v. Latimer,* 9 Kan.App.2d 728, 687 P.2d 648, 652–53 (1984). Plaintiff was charged in the complaint with violating K.S.A. 21–3808 by not only refusing to submit to fingerprinting, but also refusing to answer questions, refusing to be photographed, and refusing to change into jail clothing. Plaintiff does not dispute that he refused to be fingerprinted, refused to be photographed, and refused to change into jail clothing. He simply argues that defendants had no duty to fingerprint him under the relevant statute.

K.S.A. 21–2501 makes it the statutory duty of the sheriff to fingerprint arrestees under certain circumstances. The court agrees with the plaintiff's argument that none of those specific circumstances were applicable at the time plaintiff was admitted to the Osage County jail. However, the fact that K.S.A. 21–2501 requires the sheriff to fingerprint arrestees meeting specific criteria does not preclude him from lawfully establishing a jail policy, pursuant to the authority vested in his office by K.S.A. 19–811, requiring his deputies to fingerprint all arrestees admitted to the jail, regardless of the offense for which they were arrested. It is undisputed that Sheriff Ordonez had established such a policy. Since he did so, his deputies had a legal duty to implement the policy, and plaintiff's refusal to comply gave them probable cause to suggest prosecution for obstructing them in their official duty.

Further, even if we assumed for purposes of argument that the defendants lacked probable cause for prosecuting plaintiff specifically for refusing to be fingerprinted, plaintiff has not advanced any evidence establishing a lack of probable cause for basing the obstruction charge on his refusal to be photographed and his refusal to don jail clothing, both of which were part of the jailers' official duties.

■ Moreover, in order to establish a § 1983 claim for malicious prosecution, it is necessary (albeit not sufficient) for the plaintiff to make a showing on each of the elements of the state law tort. *Coogan v. City of Wixom,* 820 F.2d 170, 174 (6th Cir.1987). Plaintiff has submitted no persuasive evidence to show that defendant Manning, Nitcher, or Ordonez acted maliciously[23] in suggesting the charge of obstructing official duty. Since malice is an essential element of the state tort claim of malicious prosecution, plaintiff has not established either a state law tort claim or a § 1983 claim for malicious prosecution.[24]

---

cause without success at an earlier stage of the state proceedings. *See, e.g., Coogan v. City of Wixom,* 820 F.2d 170, 175 (6th Cir.1987), and cases cited therein. However, that principle does not permit the plaintiff to use offensively in a § 1983 action the fact that the state court dismissed a charge against the plaintiff to establish the absence of probable cause or reasonable suspicion. *See Thompson v. General Finance Co.,* 205 Kan. 76, 468 P.2d 269, 285 (1970) (prior determination of no probable cause cannot be used as positive finding that prosecution was commenced without probable cause for purposes of malicious prosecution claim). Further, in this case, the specific reasons for the state court's dismissal of the obstruction charges were not articulated on the record.

**23.** Malice is established for purposes of a malicious prosecution claim when a criminal proceeding is intentionally instituted with any other motive than to punish the crime or to bring criminals to justice. *Crow v. United States,* 659 F.Supp. at 573.

**24.** If the facts in an action for malicious prosecution are not in dispute, questions regarding the absence of probable cause and the existence of malice may be decided by the trial court as matter of law. *See Sampson v. Hunt,* 665 P.2d at 753; *Carnegie v. Gage Furniture, Inc.,* 217 Kan. 564, 538 P.2d 659, 663 (1975); *Messenger v. Fulton,* 173 Kan. 851, 252 P.2d 904, 907 (1953); *see also Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* —— U.S. ——, ——, 113 S.Ct. 1920, 1930, 123 L.Ed.2d 611 (1993) (where there is no dispute over predicate facts of underlying legal proceeding, a court may decide probable cause as a matter of law).

Finally, the court holds as a matter of law that the defendants' participation in the prosecution of plaintiff for obstructing the official duty of defendants Manning and Nitcher in booking plaintiff into jail does not rise to the egregious level required to support a § 1983 claim for malicious prosecution. Since the court holds as a matter of law that plaintiff has presented insufficient evidence to support his § 1983 claim for malicious prosecution, defendants Ordonez, Nitcher, and Manning are entitled to summary judgment as a matter of law.

### E. *Right to Counsel*

Plaintiff's next claim is that defendants Nitcher, Manning, Dunn, and Fozdick, acting in their personal capacities, deprived him of his Sixth and Fourteenth Amendment right to counsel. He argues that he was not permitted to contact counsel or use the telephone for over two and a half hours after he was booked into jail. He further argues that when he was permitted to use the telephone, not only on the first night but also subsequently during his detention, his calls were surreptitiously recorded by the defendants, even though he had advised them that he intended to contact his legal counsel.[25]

Defendants deny that plaintiff asked to telephone legal counsel upon his arrival at the jail. Further, they contend that he later sought counsel from individuals who were not confirmed to have been admitted to the practice of law in Kansas or any other state. They contend that the Sixth and Fourteenth Amendments do not entitle plaintiff to the advice of friends who are not trained in the law.

Plaintiff's right to counsel under the Sixth and Fourteenth Amendments did not attach until his arraignment, when adversary judicial proceedings were initiated against

him. *E.g., Michigan v. Jackson,* 475 U.S. 625, 629–30 n. 3, 106 S.Ct. 1404, 1407–08 n. 3, 89 L.Ed.2d 631 (1986). Since plaintiff's alleged violations of his right to counsel occurred prior to his arraignment, the court concludes as a matter of law that restrictions placed on his freedom to use the telephone prior to arraignment did not amount to a violation of his right to counsel under the Sixth and Fourteenth Amendments.

Nevertheless, construing plaintiff's pleadings liberally, as we are required to do, the court believes plaintiff's claim may be more properly characterized as asserting his constitutional right of access to courts,[26] rather than his Sixth Amendment right to counsel. The court will therefore address whether the plaintiff's right of access to the courts was denied by imposing restrictions on his telephone use.

Plaintiff contends that on the night he was booked into jail he repeatedly asked to make a telephone call. He further contends that he specifically told the defendants that he wanted to call an attorney to get some legal advice. Defendants deny that plaintiff ever asked to call an attorney or "legal counsel." Further, they deny that plaintiff asked to make a telephone call until about three hours after plaintiff was brought to the jail. Defendants admit, however, that telephone calls are monitored if made to persons other than legal counsel, for security reasons. They also admit that defendants Dunn, Nitcher, and Fozdick either monitored or overheard plaintiff's telephone conversations, but they deny that any of these calls were to "legal counsel" within the meaning of the Sixth Amendment.

The exact nature of telephone service to be provided to inmates is generally to be determined by prison administrators, sub-

---

**25.** Plaintiff does not contend that he was subjected to custodial interrogation at the jail in violation of his *Miranda* rights.

**26.** The exact source of the fundamental constitutional right of access to the courts is not entirely clear. The Supreme Court has referred to it as a corollary of the constitutional right to due process of law. *See Procunier v. Martinez,* 416 U.S. 396, 419, 94 S.Ct. 1800, 1814, 40 L.Ed.2d 224 (1974), *overruled on other grounds, Thornburgh v.*

*Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 1881–82, 104 L.Ed.2d 459 (1989); *see also Bounds v. Smith,* 430 U.S. 817, 818, 97 S.Ct. 1491, 1493, 52 L.Ed.2d 72 (1977) (referring to denial of access to courts as a Fourteenth Amendment violation). *But see id.* at 833, 97 S.Ct. at 1500 (Burger, C.J., dissenting) (Court leaves us unenlightened as to source of right of access).

ject to court scrutiny for unreasonable restrictions. *See Jeffries v. Reed,* 631 F.Supp. 1212, 1219 (E.D.Wash.1986) (citing *Feeley v. Sampson,* 570 F.2d 364, 374 (1st Cir.1978); *see also Martin v. Tyson,* 845 F.2d 1451, 1458 (7th Cir.) (pretrial detainees' due process rights not violated by limitations on telephone access), *cert. denied,* 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988). One court has held that pretrial detainees have a constitutional right under the First Amendment to communicate with persons outside the prison by mail, visits, and telephone calls. *See Moore v. Janing,* 427 F.Supp. 567, 576 (D.Neb.1976). *But see Williams v. McClain,* 708 F.Supp. 1086, 1088 (W.D.Mo.1989) (pretrial detainee's assertions he was denied telephone privileges not so egregious as to rise to the level of alleged constitutional violation, where allegations were not claimed to represent more than negligence or misunderstanding by jail personnel); *Wooden v. Norris,* 637 F.Supp. 543, 558 (M.D.Tenn.1986) (approving correctional policy placing restrictions on inmates' use of telephone over objection they unconstitutionally restricted access to courts and counsel).

It has been held that eavesdropping or monitoring of detainee phone calls is constitutionally objectionable. *See Moore v. Janing,* 427 F.Supp. at 576 (citations omitted); *see also Tuggle v. Barksdale,* 641 F.Supp. 34, 37–38 (W.D.Tenn.1985) (although reasonable to have jail officer determine to whom inmate places legal call and dial phone number, officers may not listen to conversation). *But see Feeley v. Sampson,* 570 F.2d at 374 (reasonable ways of accommodating detainees' interests with those of the jail might include making telephone access contingent on authority of guards to monitor conversations).

Further, the presence of a custodial officer when detainees place or receive a phone call has been deemed to raise "serious constitutional questions." *Moore v. Janing,* 427 F.Supp. at 576 (quoting *Brenneman v. Madigan,* 343 F.Supp. 128, 141 (N.D.Cal.1972)). At least one court has held that such a practice in a county jail threatened detainees'

First and Sixth Amendment rights as well as their attorney-client privilege, and consequently enjoined it in a § 1983 action. *Id.* at 576.[27]

■ Even if the court assumes, without deciding, that plaintiff had a constitutional right to contact outside persons by telephone for legal advice without monitoring by jail officials, the court concludes that plaintiff has not met his burden of showing that his asserted right was clearly established at the time of the violation. While it is clearly established that pretrial detainees have a constitutional right to adequate, effective, and meaningful access to courts, *Love v. Summit County,* 776 F.2d 908, 912 (10th Cir.1985), *cert. denied,* 479 U.S. 814, 107 S.Ct. 66, 93 L.Ed.2d 25 (1986), it is not clearly established that a pretrial detainee has a constitutional right to contact non-attorneys by telephone for legal advice. *See Wooden v. Norris,* 637 F.Supp. at 555–56 n. 4 (collecting cases addressing whether or not inmates have a constitutional right to contact persons outside prison). Hence even if the court construes the plaintiff's claim liberally to assert denial of access to courts, defendants would be entitled to qualified immunity on such a claim. The court will therefore grant summary judgment to the defendants on plaintiff's claim asserting his right to counsel.

### F. Right of Access to Legal Materials and Law Library

■ Plaintiff next claims that Sheriff Ordonez denied him his Sixth and Fourteenth Amendment rights by denying him access to legal materials and a law library during the time plaintiff was detained in jail. Plaintiff claims that as a result of the deprivation he was unable to effectively represent himself at either his initial appearance before the magistrate or at his arraignment hearing.

It is uncontroverted that plaintiff submitted a formal administrative demand to Sheriff Ordonez for several lawbooks. While

---

**27.** The Fourth Amendment, however, has been held not to prohibit the monitoring and recording by prison officials of inmates' telephone conversations in order to preserve security and or-

derly management of the institution, and to protect the public. *E.g., Lee v. Carlson,* 645 F.Supp. 1430, 1483 (S.D.N.Y.1986), *aff'd,* 812 F.2d 712 (2d Cir.1987).

many of plaintiff's requests were met, including all Kansas statutes and regulations he requested, some of the items he requested were not supplied. It is uncontroverted that plaintiff was not provided access to a law library. Nor was plaintiff provided access to an attorney until December 11, the fifth day of his detention.

■ *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) is the seminal case addressing the rights of inmates to access legal materials. The Supreme Court in that case held that the fundamental right of access to the courts requires prison authorities to assist inmates in preparing and filing of meaningful legal papers, by providing them with either adequate law libraries or adequate assistance by persons trained in the law. *Id.* at 828, 830–32, 97 S.Ct. at 1498, 1499–1500. While a plan to provide the constitutionally required legal access need not necessarily include any particular element, any plan must be evaluated as a whole to determine whether it complies with constitutional standards. *Bounds v. Smith,* 430 U.S. at 832, 97 S.Ct. at 1500.

■ The availability of legal assistance at government expense [28] is a constitutionally permissible alternative means of access to courts, and when such means of access is provided, an inmate may not reject the method provided and insist on the avenue of his or her own choosing. *United States v. Wilson,* 690 F.2d 1267, 1272 (9th Cir.1982), *cert. denied,* 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 178 (1983). Hence, the fact that plaintiff objected to the court's appointment

of counsel cannot be considered in evaluating his claim that he was denied access to adequate legal materials.

In *Ruark v. Solano,* 928 F.2d 947 (10th Cir.1991), the Tenth Circuit held that the lower court improperly dismissed an inmate's claim alleging that he was totally denied access to a law library or alternative legal resources for the entire nine months of his confinement. The Court of Appeals rejected the lower court's reasoning that the plaintiff had not alleged why he needed a law library nor alleged how he was prejudiced by not having access to one.[29] The court distinguished two of its prior cases, noting that in *Ruark* there had been no showing that plaintiff had access to alternative legal resources. The court concluded that "[a] prisoner's constitutional right to access to legal resources is not conditioned on a showing of need." *Id.* at 950 (citations omitted). In contrast, in *Love v. Summit County,* 776 F.2d at 914–15, the court held the plaintiffs had shown no prejudice from lack of access to law libraries when they had adequate access to alternative legal resources.[30] In *Love,* a pretrial detainee did not establish a constitutional violation by showing that he was denied access to the county law library, because he had access to counsel at all times during his incarceration. *Love,* 776 F.2d at 914.

In this case, unlike *Ruark,* the plaintiff was provided with the Kansas statute books and regulations he specifically requested. A plan to provide inmates with appropriate legal resources to permit access to courts need not include any particular element. In this

**28.** The affirmative duty of the state to assist an inmate in the preparation and filing of meaningful legal papers does not depend on a showing of indigency. Hence, even if an inmate is not indigent and has adequate financial resources to employ counsel of his choice, the state nevertheless has the constitutional obligation to provide adequate law libraries or adequate assistance from persons trained in the law. *See Straub v. Monge,* 815 F.2d 1467, 1469–70 (11th Cir.), *cert. denied,* 484 U.S. 946, 108 S.Ct. 336, 98 L.Ed.2d 363 (1987).

**29.** The defendants rely on cases decided by the Seventh Circuit in arguing that the plaintiff must also show prejudice. The Tenth Circuit has not squarely held that prejudice must be established in order to prevail on a § 1983 claim for denial

of access to legal resources. However, even if prejudice is required, plaintiff's argument is persuasive that he might have been released on his own recognizance without bond on December 9, 1991, the date of his first appearance before a magistrate, had he obtained earlier access to legal materials in support of dismissal of the two obstruction charges. *See* K.S.A.1992 Supp. 22–2802; K.S.A. 22–2815.

**30.** In *Harrell v. Keohane,* 621 F.2d 1059, 1060 (10th Cir.1980), plaintiff did not assert that the reference material in the law library to which he had access was inadequate; instead he claimed its physical capacity was too small because it could accommodate only five inmates at any one time. 621 F.2d at 1060.

case, the defendants made a good faith effort to comply with plaintiff's request for legal materials to the extent it was feasible for them to do so. It is simply unrealistic to expect a small, rural county jail to supply its detainees and inmates with a full range of legal resources.

■ Even if plaintiff had a constitutional right to access additional legal material that he requested but which were not provided to him, the court concludes that the defendants are entitled to qualified immunity on this claim. Whether or not the constitutional right plaintiff alleges was violated was clearly established at the time, the court cannot conclude that a reasonable law enforcement officer would have known that refusing to give plaintiff access to such additional resources was a violation of the law. Defendants are therefore entitled to summary judgment on plaintiff's claim that he was denied access to appropriate legal materials.

### G. *Denial of Religious Diet*

■ Plaintiff claims that defendants Ordonez, Nitcher, Manning, and Dunn violated his First and Eighth Amendment rights by failing to comply with his religious diet during the first four to five days of his detention in jail. He contends that he never demanded any special religious foods, but simply asked to be fed sufficient amounts of foods not proscribed by his religion. The defendants contend that plaintiff's requests were not understandable to them.[31] They further argue that after they ascertained plaintiff's demands, and had an opportunity to comply, they did so. Defendants do not contest the sincerity of plaintiff's religious beliefs.

■ At the outset, the court notes that a pretrial detainee cannot invoke the Eighth Amendment's prohibition against cruel and unusual punishment, since that constitutional provision applies only to inmates convicted of a crime and therefore subject to

punishment. *See Meade v. Grubbs,* 841 F.2d 1512, 1519 n. 4 (10th Cir.1988) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979)). Nevertheless, pretrial detainees are entitled at minimum to the same protection as prisoners, based upon a due process standard that protects pretrial detainees from punishment. *Bell v. Wolfish,* 441 U.S. at 535 n. 16, 545, 99 S.Ct. at 1872 n. 16, 1877; *Meade v. Grubbs,* 841 F.2d at 1530.

■ Prisoners have a right to receive diets consistent with their religious tenets. *Benjamin v. Coughlin,* 905 F.2d 571, 579 (2d Cir.) (citing *Kahane v. Carlson,* 527 F.2d 492, 495 (2d Cir.1975)), *cert. denied,* 498 U.S. 951, 111 S.Ct. 372, 112 L.Ed.2d 335 (1990). It has been held that the failure to provide foods certified to satisfy the dietary laws of a prisoner's religion violates the prisoner's First Amendment rights. *See Prushinowski v. Hambrick,* 570 F.Supp. 863, 866–67 (E.D.N.C.1983). However, other courts have held that a prisoner is not entitled to a special diet if adequate nourishment can be obtained from other foods that are not objectionable to him on religious grounds. *See Wilson v. Prasse,* 325 F.Supp. 9, 13 (W.D.Pa. 1971), *aff'd,* 463 F.2d 109 (3d Cir.1972); *see also Martinelli v. Dugger,* 817 F.2d 1499, 1508 (11th Cir.1987) (prisoner's religious belief that he should eat only kosher meats entitled him only to select non-pork items from the prison's regular menu), *cert. denied,* 484 U.S. 1012, 108 S.Ct. 714, 98 L.Ed.2d 664 (1988); *Abernathy v. Cunningham,* 393 F.2d 775, 778 (4th Cir.1968) (prisoner could obtain adequate ration from cafeteria selection by voluntarily avoiding pork or food cooked in grease or lard; prison not required to provide special religious diet to prisoner required to abstain from such foods); *Masjid Muhammad–D.C.C. v. Keve,* 479 F.Supp. 1311, 1318–19 (D.Del.1979) (Muslim inmates entitled to diet providing adequate nourishment without consumption of pork, but pris-

---

**31.** The court has carefully searched the voluminous record submitted in support of the parties' summary judgment motions, but has not located a copy of the initial written request for a special diet submitted by the plaintiff to his jailers on December 7, cited by the defense as Defendant's Exhibit 9. Plaintiff's Administrative Demand

No. 2, submitted on December 10, demands that the Sheriff provide him with his religious diet, citing numerous biblical references by chapter and verse number. The administrative demand also states, "The prizoner [sic], Rodney Joe Fillmore[,] is a Hebrew of the House of Israel and practices the dietary laws of the creator."

on need not provide special pork-free diet). Further, one court has held that the administrative costs and other problems associated with providing special religious diets outweighed the prisoner's right to free exercise of his religion. *See Udey v. Kastner,* 644 F.Supp. 1441, 1493, 1449 (E.D.Tex.1986), *aff'd,* 805 F.2d 1218 (5th Cir.1986).

Nevertheless, in the absence of precedent from the United States Supreme Court or the Tenth Circuit, the court cannot conclude that the plaintiff had a clearly established constitutional right to additional servings of foods permitted by his religious diet, even if the court agreed with the plaintiff that his religious diet requirements were made sufficiently clear to the defendants. Since plaintiff has not established that his right to a substitute diet was clearly established in this circuit, defendants are entitled to qualified immunity on plaintiff's claim that they unduly delayed providing the plaintiff with a diet in compliance with his religious requirements.

## H. *Denial of Mattress; other Adverse Sleeping Conditions*

Plaintiff claims that defendant Ordonez violated his Eighth and Fourteenth Amendment rights due to certain adverse living conditions during his confinement. Plaintiff alleges that the defendant held him for approximately 18 hours in a detoxification cell without benefit of a mattress, and supplied him with a hard, uncomfortable mattress for 4 of the days he was detained in a regular cell. Plaintiff also claims that the defendants knew about his back condition, which caused him pain and suffering as a result of the hard, uncomfortable sleeping surfaces. Further, plaintiff contends that he was deprived of sleep because of the beeping devices and lights that were continuously operating in his cell. Plaintiff characterizes these allegedly adverse sleeping conditions as "torture."

Defendant contends that plaintiff's allegations fall short of a showing of "deliberate

indifference" they contend applies to plaintiff's claim in this circuit, citing *Clemmons v. Bohannon,* 956 F.2d 1523 (10th Cir.1992). They contend that plaintiff suffered no significant injury as a result of the claimed deprivations, and that the requisite state of mind is negated.

As noted previously, the Eighth Amendment's prohibition against cruel and unusual punishment is inapplicable to the claims of a pretrial detainee who has not been convicted of a crime. Instead, the applicable standard is Fourteenth Amendment due process.

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court held that in evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate no express guarantee of the Constitution, but rather implicate only the protection against deprivation of liberty without due process, the proper inquiry is whether or not the challenged conditions amount to punishment of the detainee.[32] *Id.* at 535–37 & n. 16, 99 S.Ct. at 1871–73 & n. 16. The court must decide whether the alleged deprivation is imposed for the purpose of punishment or whether it is simply an incident of some other legitimate governmental purpose. *Id.* at 538, 99 S.Ct. at 1873. Absent a showing of express intent to punish, that determination will generally turn on whether the particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective. *Id.* at 538–39, 99 S.Ct. at 1873–74. If so, it does not, without more, amount to "punishment" in violation of the due process rights of pretrial detainees. *Id.* at 539, 99 S.Ct. at 1874.

The Court in *Bell v. Wolfish* went on to reject the argument that the government's interest in ensuring a detainee's presence at trial is the only objective that may reasonably justify restraints and conditions of detention. *Id.* at 540, 99 S.Ct. at 1874.

---

**32.** The court declines to apply the standard of deliberate indifference to plaintiff's claim alleging adverse sleeping conditions. The deliberate indifference standard has been applied to Eighth Amendment claims brought by prisoners, and reflects the culpable state of mind required on the part of the defendants in order to prevail on a

claim of cruel and unusual punishment. *See, e.g., Clemmons v. Bohannon,* 956 F.2d at 1525–26. Plaintiff, however, was a pretrial detainee. As such, he had a constitutional due process right to be protected from punishment of any sort, not just punishment characterized as cruel and unusual.

The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees. Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.

*Id.*

Furthermore, the substantial deference the courts accord to prison administrators warrants judicial restraint in interfering with their domain of expertise. Therefore, "in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, the courts should ordinarily defer to their expert judgment in such matters." *Id.* at 548, 99 S.Ct. at 1879. As the Court succinctly summarized its analysis, "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546, 99 S.Ct. at 1878.

■ Applying these principles to plaintiff's allegations, the court has no difficulty holding as a matter of law that the electronic surveillance system, with its around-the-clock beeping and soft lighting, was reasonably related to the maintenance of internal security of the Osage County jail, and as such did not amount to punishment prohibited by the Due Process Clause.

■ The court also concludes that plaintiff's allegations concerning the hard, uncomfortable mattress in his cell do not rise to the level of an unconstitutional deprivation of liberty. Plaintiff does not allege that an orthopedic mattress was medically prescribed for his back condition. Nor does he allege that the defendants intended to punish him. He merely complains that he should have been provided with a thicker, more comfortable mattress.[33]

The court concludes that plaintiff's complaint amounts to a *de minimis* imposition which does not violate any constitutional prohibition. *See Cotton v. Hutto,* 540 F.2d 412, 414 (8th Cir.1976) (rejecting state prisoners' constitutional argument that their mattresses were too thin). "[T]he fact that [pretrial] detention interferes with the detainee's understandable desire to live as comfortably as possible ... during confinement does not convert the conditions ... of detention into 'punishment.'" *Bell v. Wolfish,* 441 U.S. at 537, 99 S.Ct. at 1873.[34]

■ However, the court finds troubling the fact that plaintiff was held for some 18 hours in the jail's detoxification cell without a mattress, chair, or pillow. Defendants do not contend that plaintiff was intoxicated, disoriented, self-destructive, or violent when he was booked into jail. At most, he refused to answer certain questions, refused to be fingerprinted and photographed, and refused to change into standard jail clothing. Defendants Nitcher and Manning had contacted plaintiff's physician and knew about plaintiff's spinal disorder. The court cannot determine from the undisputed facts any legitimate rationale for detaining plaintiff overnight and the better part of the next day in a cell without bedding or seating.

Nevertheless, the plaintiff asserts his claim concerning his detention in the detoxification

33. The court is not persuaded by plaintiff's argument that his family offered to supply him with an acceptable mattress. The Supreme Court in *Bell v. Wolfish,* 441 U.S. at 553–55, 99 S.Ct. at 1881–82, specifically held that jail officials need not permit pretrial detainees to receive food or personal property from outside the institution. *See also Thornburgh v. Abbott,* 490 U.S. 401, 416, 109 S.Ct. 1874, 1883, 104 L.Ed.2d 459 (1989) (where prison regulation concerns entry of materials into prison, regulation that gives prison authorities broad discretion is appropriate).

34. Given the court's disposition of plaintiff's claim regarding the conditions of his jail cell in favor of the defendants, plaintiff's motion to allow the jury to view the cell (Doc. 39) is rendered moot.

cell without a mattress only against Sheriff Ordonez, and not against any of the other defendants who were present at the jail on the night he was initially detained. Plaintiff has not alleged that defendant Ordonez in any way directly participated in the decision to hold him in the detoxification cell. Defendant Ordonez cannot be held vicariously liable for the acts of his employees, because the doctrine of *respondeat superior* does not apply under § 1983. *Monell v. Department of Social Services of City of New York*, 436 U.S. at 691, 98 S.Ct. at 2036; *Ware v. Unified School District No. 492*, 902 F.2d at 819. The court therefore concludes that defendant Ordonez is entitled to summary judgment on plaintiff's claims concerning the sleeping conditions in both the detoxification cell and the regular jail cell.

## I. *Deliberate Infliction of Pain*

■ Plaintiff contends that defendant Fozdick violated his First, Eighth, and Fourteenth Amendment rights after the plaintiff slipped and fell while stepping out of the shower in his cell. Plaintiff claims that the fall exacerbated his pre-existing back problems, resulting in extreme pain and suffering.[35] Further, he contends that after he was examined at the hospital, the defendant deliberately forced him into a 90–degree bent posture and placed him in a wheel chair despite his protests, causing plaintiff pain and suffering.

Defendant Fozdick contends that the plaintiff has not established deliberate indifference with regard to the condition of the floor on which plaintiff fell, and that mere negligence does not violate either the due process clause or the deliberate indifference standard. Further, he contends that he had reason to be skeptical of plaintiff's protestations of pain at the hospital when he was placed in a seated position rather than a supine position, based on the information then available to him about plaintiff's injury. Finally, he contends that the right to be free from an intentional infliction of pain, without a significant injury, was not clearly established at the time of the alleged violation, and he is therefore entitled to qualified immunity.

The court reiterates that cases establishing the standard for analyzing Eighth Amendment claims of cruel and unusual punishment do not state the applicable standard for analyzing a claim asserted by a pretrial detainee that he was punished in violation of his constitutional right to due process. As the Supreme Court held in *Bell v. Wolfish*, the issue is whether the challenged conduct amounted to *punishment*. Cruel and unusual punishment characterized by the culpable mental state of deliberate indifference to serious medical needs [36] would clearly violate the due process proscription against punishing pretrial detainees. *See Martin v. Tyson*, 845 F.2d 1451, 1457 (7th Cir.), *cert. denied*, 488 U.S. 863, 109 S.Ct. 162, 102 L.Ed.2d 133 (1988) (act or practice that violates Eighth Amendment also violates due process rights of pretrial detainees) (citation omitted). However, the Supreme Court has clearly held that the Constitution prohibits *any kind of punishment* of pretrial detainees, not just punishment so severe as to amount to an Eighth Amendment violation.

■ To the extent that plaintiff's claim challenges the slippery condition of his cell floor, the court agrees with the defendant that mere negligence resulting in unintended injury does not amount to a denial of plaintiff's due process rights. *See Daniels v. Williams*, 474 U.S. 327, 328, 332–33, 106 S.Ct. 662, 663, 665–66, 88 L.Ed.2d 662 (1986). However, plaintiff does not contend that de-

---

**35.** Plaintiff further contends that although he was transported to the hospital for examination, he was not admitted for treatment as he requested. However, the evidence clearly shows that the decision not to admit plaintiff was made by Dr. Kumar, not defendant Fozdick, and there is no argument that the doctor was acting as the defendant's agent. This claim is therefore without merit. Further, the court believes that defendant complied with plaintiff's constitutional right to receive medical treatment for the injury he sustained when he fell. *See City of Revere v.*

*Massachusetts General Hospital*, 463 U.S. 239, 245, 103 S.Ct. 2979, 2983, 77 L.Ed.2d 605 (1983) (defendant fulfilled constitutional obligation by seeing that injured criminal suspect was taken promptly to hospital for treatment).

**36.** *See Helling v. McKinney*, —— U.S. ——, ——, 113 S.Ct. 2475, 2480, 125 L.Ed.2d 22 (1993) (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976)).

fendant Fozdick was negligent in forcing him to a seated position, thereby causing him pain and suffering. Rather, plaintiff contends that defendant Fozdick acted deliberately despite plaintiff's protestations of pain. If defendant Fozdick deliberately inflicted pain, the plaintiff's due process right to be protected from punishment was clearly implicated.

However, the court concludes that defendant Fozdick's actions were justified by his legitimate interests in securing plaintiff for the return trip to the jail. Since plaintiff's injury was not medically sufficient to warrant his admission to the hospital,[37] it was defendant Fozdick's duty to return him to Osage County Jail. In order to do so, it was necessary to ensure plaintiff was properly dressed for the winter weather and properly restrained for his own safety and for security reasons on the return trip to the jail. Since the challenged conduct was reasonably related to the legitimate governmental objective of returning plaintiff safely and securely to the jail, it does not amount to "punishment."[38] *See Bell v. Wolfish*, 441 U.S. at 538–39, 99 S.Ct. at 1873–74. The court therefore concludes as a matter of law that defendant Fozdick is entitled to qualified immunity on this claim.

### J. Violations of Federal Standards for Prisons and Jails

■ Plaintiff contends that defendant Ordonez violated his Fourteenth Amendment rights by denying him physical contact with visitors,[39] denying him the opportunity to examine the contents of his jail record, denying him a copy of the jail's regulations, and refusing his request to turn his cell light on and off. Plaintiff contends that each of these rights is afforded by the *Federal Standards for Prisons and Jails*, §§ 12.12, 21.19, 8.08,

and 8.09 respectively. Defendant Ordonez argues that the Federal Standards do not apply to a state facility such as Osage County jail, which houses federal prisoners only on a temporary, contractual basis.

The court agrees with defendant Ordonez' argument that the *Federal Standards for Prisons and Jails*, published in 1980 by the United States Department of Justice, do not provide the basis for a § 1983 claim. *See Rhodes v. Chapman*, 452 U.S. 337, 348–49 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981) (opinions of experts as to desirable prison conditions "simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question") (quoting U.S. Dep't of Justice, *Federal Standards for Prisons and Jails* 1 (1980)); *Bell v. Wolfish*, 441 U.S. at 543–44 n. 27, 99 S.Ct. at 1876–77 n. 27 (draft Federal Standards for Corrections issued by Department of Justice in 1978 are not determinative of the requirements of the Constitution); *Wright v. Rushen*, 642 F.2d 1129, 1134 n. 4 (9th Cir.1981) (same); *Toussaint v. Rushen*, 553 F.Supp. 1365, 1384 n. 16 (N.D.Cal.1983) (Federal Standards for Prisons and Jails not dispositive). Nor do such standards amount to federal "laws" within the meaning of § 1983. Defendant Ordonez is therefore entitled to summary judgment as a matter of law on the plaintiff's claims based on the *Federal Standards for Prisons and Jails*.

### Conclusion

In summary, the defendants are granted summary judgment on each claim asserted by the plaintiff, for the reasons stated in this memorandum decision.

**IT IS BY THE COURT THEREFORE ORDERED** that plaintiff's motion for summary judgment (Doc. 59) is denied.

---

**37.** Defendant Fozdick reasons that it had not been established as of December 1991, that a significant injury was not a prerequisite for an Eighth Amendment claim. *See Hudson v. McMillian*, — U.S. —, ——–——, 112 S.Ct. 995, 999–1000, 117 L.Ed.2d 156 (1992) (use of excessive physical force against prisoner may constitute cruel and unusual punishment even though inmate suffers no serious injury). As the court has already emphasized, however, the Eighth Amendment is not the applicable standard to apply to a pretrial detainee's claim of unconstitutional punishment.

**38.** Plaintiff does not contend that defendant Fozdick expressed any intent to punish him.

**39.** The Supreme Court has held that denying pretrial detainees physical contact with visitors is not actionable under § 1983. *See Block v. Rutherford*, 468 U.S. 576, 583–89, 104 S.Ct. 3227, 3231–34, 82 L.Ed.2d 438 (1984).

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment (Doc. 56) is granted.

**IT IS FURTHER ORDERED** that the plaintiff's motion to allow the jury to view plaintiff's cell (Doc. 39) is denied as moot.

**IT IS FURTHER ORDERED** that the plaintiff's motion in limine (Doc. 42) is denied as moot.

**IT IS FURTHER ORDERED** that the clerk shall enter judgment in favor of the defendants.